**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CHICAGO MERCANTILE EXCHANGE INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 18 C 1376** |
| ) | |
| **ICE CLEAR US, INC., ICE CLEAR EUROPE** ) | |
| **LIMITED, and INTERCONTINENTAL** ) | |
| **EXCHANGE, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

**CORRECTED
MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Chicago Mercantile Exchange Inc. (CME) has sued ICE Clear US, Inc., ICE

Clear Europe, Limited, and Intercontinental Exchange, Inc. (ICE) for trademark

violations, unfair competition, breach of contract, and deceptive practices. ICE Clear

US and ICE Clear Europe (collectively, the ICE Licensees) have asserted counterclaims

for breach of contract; ICE has asserted counterclaims alleging the invalidity of CME's

mark due to genericness and abandonment by naked licensing; and the defendants all

have asserted defenses to CME's claims. Each side has moved for partial summary

judgment.

**Background**

**A.    Factual background**

The following facts are undisputed except where otherwise noted. CME is a

corporation that operates a clearinghouse and provides financial and risk management

services to commodity traders. The ICE Licensees are corporations that are indirect subsidiaries of ICE and also operate clearinghouses. Clearinghouses act as intermediaries between buyers and sellers of commodities, thereby reducing the risk that parties will default on a trade and providing stability to markets. One way that clearinghouses ensure against default is by setting requirements for initial margins, which are upfront payments that the clearinghouses' members must make to use their services.

In the 1980s, CME developed a method, called the SPAN framework, for financial institutions to assess the risk of portfolios. The term SPAN is an acronym for standard portfolio analysis of risk. One aspect of the SPAN framework enables clearinghouses to set initial margins by determining how various scenarios or market conditions might affect an individual portfolio's profits or losses. CME owns four incontestable trademarks related to the SPAN framework. It licenses the use of its marks to third parties and makes available the licensees' daily risk array files, which contain data relating to their calculations of initial margins, on its FTP (file sharing) site.

In June and July 2007, CME entered into license agreements with ICE Clear Europe and ICE Clear US that permitted them to use for ten years "the name and mark SPAN® . . . in connection with a risk evaluation and margin framework." Pls.' L.R. 56.1 Stmt., Ex.1, dkt. no. 165-3, at 2.[1] The license agreements stated that they were governed by Illinois law. They prohibited the ICE Licensees from using any mark that

---

[1] The relevant portions of CME's license agreements with ICE Clear US and ICE Clear Europe are identical. When quoting from the agreements, Court cites to only the agreement with ICE Clear US, but the quoted language is also in CME's agreement with ICE Clear Europe under the same pincite. *See, e.g.*, Pls.' L.R. 56.1 Stmt., Ex. 3, dkt. no. 165-5, at 2.

2

was "confusingly similar" to the SPAN mark during the terms of the agreements. *Id.* ¶ 7(f). They required the ICE Licensees to include statements on all their materials relating to the SPAN framework to disclose that the SPAN mark was a registered trademark of CME being used pursuant to a license. And they set out the parties' obligations with respect to the daily publication of the ICE Licensees' risk array files on CME's FTP site.

The agreements also required CME to "control the nature and quality of all goods and services identified by" the SPAN mark. *Id.* ¶ 1(c). They required the ICE Licensees to permit CME to review and inspect their goods and services that used the SPAN mark. They obligated the ICE Licensees to modify to their "SPAN-related performance bond calculation systems" when CME required them to do so in order to "conform" their calculations with CME's technical specifications. *Id.* ¶ 7(b). The agreements stated that they could be amended or modified only in writing. And they provided that upon their termination, the ICE Licensees agreed "not to use any mark that is confusingly similar to the SPAN Mark in connection with any other margining system or similar risk calculation." *Id.* ¶ 5(a).

In 2009, CME contacted ICE regarding ICE Clear Europe's use of the phrase "ICE SPAN" in relation to its risk management products and services. The parties dispute whether CME's license agreement with ICE Clear Europe permitted it to use that phrase. Nonetheless, ICE Clear Europe eliminated the phrase from its website, software, and other materials. The parties dispute whether ICE Clear Europe resumed using the phrase in 2015, but they do not dispute that ICE Clear US used it in 2015.

In 2014, CME had internal discussions regarding the ICE Licensees' SPAN

3

implementations and those of another licensee, the London Clearing House. A CME employee involved in product management wrote in an e-mail that CME chose to "ignore" unilateral changes that the ICE Licensees made to the SPAN algorithm, which caused their calculations to "deviate." Defs.' L.R. 56.1 Stmt., Ex. 73, dkt. no. 181-6, at 131–32. Another CME employee wrote that London Clearing House "changed the methodology that is native to SPAN." *Id.* at 131. In a subsequent e-mail, the first employee responded by saying that it appeared as though the London Clearing House may not have made "any actual changes" to SPAN and that "the issues could be with . . . functionality" and might be "easily" fixed. *Id.* at 130.

The license agreements expired in June and July 2017, but the ICE Licensees continued to use the term SPAN in reference to their risk management systems. Specifically, ICE Clear US continued to use the phrase "SPAN® Margin Model" in connection with its risk management services, ICE Clear Europe continued to use the word "SPAN" in connection with its services, and both ICE Licensees continued to include in their materials disclosures stating that the SPAN mark was a registered trademark of CME being used pursuant to a license. Pl.'s L.R. 56.1 Stmt., dkt. no. 188, ¶¶ 59–62, 92, 193. In at least some instances, the ICE Licensees used the phrase "SPAN for ICE" in connection with their services.

There is evidence suggesting that, at first, none of the defendants were aware that the license agreements had terminated and that CME upheld at least some of its obligations under the agreements after their termination. According to CME's Rule 30(b)(6) witness, upon the termination of a license agreement, CME will stop publishing the licensee's data, and CME's software will no longer support the licensee's product.

4

Despite this, the ICE Licensees' daily risk array files continued to be published on CME's FTP site. The parties dispute whether the ICE Licensees sent the files to CME to publish or whether the ICE Licensees themselves posted the files to the site.

On August 10, 2017, an in-house attorney for CME, Matthew Kelly, sent to ICE's general counsel, Jonathan Short, a letter stating that the ten-year term of the license agreements had run and that the ICE Licensees had no license to use the SPAN mark or framework. Kelly wrote that Short should contact him if ICE was "interested in discussing new licensing agreements with CME" and that, before entering into "new" agreements, "ICE must demonstrate its good faith efforts to cease the misuse of CME's SPAN® brand." Pls.' L.R. 56.1 Stmt., Ex. 16, dkt. no. 165-18, at 3. Kelly also wrote that if ICE did not enter into an agreement with CME, then it must stop using CME's mark. In the letter, he identified several areas of alleged noncompliance by the ICE Licensees, including their alleged misuse of the SPAN mark in combination with ICE's marks and their failure to properly attribute the mark to CME. Near the conclusion of the letter, Kelly wrote, "We look forward to receiving confirmation that ICE is taking all necessary steps to comply with its obligations under the License Agreement." *Id.* at 5.

As general counsel for ICE, Short had the authority to enter into agreements valued at up to two or five million dollars on behalf of the company's subsidiaries, including the ICE licensees. The ICE Licensees also had their own general counsels, who reported directly to their presidents and indirectly to Short. A few days after Short received Kelly's letter, he called Kelly, and they discussed possible changes to CME's licensing model. Short has testified that he understood from the conversation that Kelly would follow up with him to provide a proposal for new license agreements after CME

5

determined the financial terms of those agreements. They spoke again about a month later, when, according to Short, Kelly said that CME still was determining new license fees and that the parties also would need to agree on new disclaimers regarding the ICE Licensees' uses of the mark. There is no evidence suggesting that Kelly told Short the proposed terms of the new fees, including whether the fees would exceed two million dollars, or that Short agreed to those terms.

On September 15, Short sent an e-mail to Kelly with proposed disclaimers. A few days later, Kelly responded that the "disclaimers look good." Defs.' L.R. 56.1 Stmt., dkt. no. 188, ¶ 340. The next day, ICE's associate general counsel sent to Kelly an e-mail stating that ICE would "start the process to update the website." *Id.* ¶ 341. According to Short, ICE then updated its website and other materials to include the new disclaimers. No one from CME contacted Short or ICE's associate general again until after CME filed this lawsuit in February 2018.

In the meantime, the ICE Licensees' risk array files continued to be published on CME's FTP site, and CME issued a notice to its clearing members that it planned to migrate the site, including data for ICE's exchanges, to a new host. According to testimony from some representatives of the ICE Licensees, they were still not aware that the licenses had terminated, that Kelly had sent a cease-and-desist letter, or that ICE and CME had been discussing the possibility of entering into new license agreements.

The defendants continued to use the SPAN mark and/or the phrase "SPAN for ICE" after CME filed suit. They contend that they removed references to SPAN on their online materials in May 2018, but CME contends that they continued to use the mark

6

after that date.  The parties do not dispute, however, that CME updated the functionality of a SPAN-related software program for certain risk array files, including those from the ICE Licensees, after the filing of the present suit.  Nor do the parties dispute that the ICE Licensees' risk array files stopped being posted to CME's FTP site in August 2018.

## B.    Procedural background

As indicated, CME filed this lawsuit in February 2018.  In counts 1 and 2 of the amended complaint, it alleges that the defendants violated 15 U.S.C. § 1114(1) by counterfeiting and infringing its registered marks.  In count 3, CME alleges that the defendants violated 15 U.S.C. § 1125(a) by engaging in unfair competition.  In count 4, it alleges that the ICE Licensees breached contracts.  In counts 5 and 6, it alleges that the defendants violated the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, and that they violated Illinois common law by engaging in unfair competition.  The defendants raised numerous affirmative defenses, including, as relevant to this opinion, invalidity of marks due to genericness and abandonment through naked licensing (defenses raised only by ICE), trademark misuse, fair use, and a defense the defendants have framed as permission to use a mark under express or implied licenses.  ICE asserted two counterclaims in which it alleges that the marks are invalid due to their genericness and abandonment by naked licensing.  The ICE Licensees each have asserted a counterclaim for breach of contract.

The ICE Licensees previously moved to dismiss part of CME's breach of contract claim as it related to provisions requiring them to use their best efforts to protect the goodwill and reputation of CME and to provide notice of any infringement of the SPAN mark to CME in writing, and to strike allegations in the first amended complaint related

7

those alleged breaches. The Court granted their motion. *Chicago Mercantile Exch. Inc. v. ICE Clear US, Inc.*, No. 18 C 1376, 2019 WL 414663, at *3 (N.D. Ill. Feb. 1, 2019).

The parties have now filed motions for partial summary judgment.

## Discussion

A party is entitled to summary judgment only if it demonstrates that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On cross-motions for summary judgment, the Court draws inferences "in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (citation omitted).[2]

## A.    Affirmative defenses

Each of the parties has moved for summary judgment on the defendants' affirmative defenses of trademark misuse; fair use; and implied consent, acquiescence, and/or estoppel by implied license.[3] No party has moved for summary judgment on the defendants' affirmative defense relating to an express license, but they all discuss it in

---

[2] CME asks the Court to deny the defendants' motions on the ground that their Local Rule 56.1 statement of facts contain errors and misrepresentations. *See* N.D. Ill. LR 56.1(b)(3)(A) & (B*)*; *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). The Court declines this request but has not considered any assertions or denials that contain facts that misrepresent the cited portion of the record or improper legal conclusions.

[3] The parties disagree whether the standards for implied consent, acquiescence, and/or estoppel by implied license are the same, an issue the Court addresses below.

their reply briefs. The Court begins its discussion of the summary judgment motions with the affirmative defenses because they present several threshold issues.

### 1. Trademark misuse

The defendants assert that CME engaged in trademark misuse by enforcing invalid trademark claims in an attempt to monopolize the market and eliminate competition. CME has moved for summary judgment against all of the defendants on this defense, and the defendants have filed a cross-motion for summary judgment.[4]

Although "courts have recognized the theoretical possibility of the antitrust misuse-unclean hands defense, in no final reported decision involving trademark infringement has a court actually refused to enforce a trademark because it was used in violation of antitrust law." 2 McCarthy on Trademarks and Unfair Competition § 31:91 (5th ed. 2019); *see also Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d 1325, 1337 (7th Cir. 1977) (antitrust misuse defenses have limited viability). For such a defense, "it is not enough merely to prove that merchandise bearing a trademark . . . has been used in furtherance of antitrust violations." *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 298 F. Supp. 1309, 1315 (S.D.N.Y. 1969), *aff'd in relevant part*, 433 F.2d 686 (2d Cir. 1970). Rather, an "essential element of the antitrust misuse defense in a trademark case is proof that the mark itself has been the basic and fundamental vehicle required and used to accomplish the violation." *Id.*; *see also Helene Curtis*, 560 F.2d at 1337.

---

[4] The defendants have indicated in their memorandum in support of their motion for summary judgment, but not in the motion itself, that they seek judgment on their misuse defense. The Court takes this as a cross-motion. This does not change the outcome of this decision.

The defendants point to no evidence of antitrust violations by CME, let alone evidence that the SPAN mark was "the basic and fundamental vehicle required and used" to accomplish such violations. *See Carl Zeiss Stiftung*, 298 F. Supp. at 1315. Accordingly, Court grants summary judgment in favor of CME on the misuse defense and denies the defendants' cross-motion for summary judgment.

### 2. Fair use

CME has moved for summary judgment on the ICE Licensees' affirmative defense of fair use. The ICE Licensees do not contest the motion, so the Court grants it. *See, e.g.*, *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

### 3. Acquiescence or implied licenses

The defendants asserted as an affirmative defense that CME permitted, pursuant to implied licenses, any infringing uses of the SPAN mark by the defendants that occurred after the termination of the license agreements. CME has moved for summary judgment on this defense with respect to the ICE Licensees by arguing that CME did not acquiesce to their uses of the mark. Without citing to authority, CME contends that courts apply to a defense involving implied licenses the same standard that they apply to a defense of acquiescence. The defendants also seek summary judgment on this defense, but they contend that a defense of estoppel by implied licenses is distinct from a defense of acquiescence.[5] To the extent the standard for acquiescence applies, the

---

[5] As with their trademark misuse defense, the defendants have indicated in their memorandum in support of their motion for summary judgment, though not in the motion itself, that they seek summary judgment on the defense they frame as estoppel by

defendants suggest that CME acquiesced in their use of the SPAN mark until the parties had finalized new license agreements.

Regardless of how it is framed, the application of this defense is an issue for the Court; it is not an issue for the jury.  *See Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, No. 12 C 9686, 2016 WL 723135, at *2 (N.D. Ill. Feb. 24, 2016); *see* Federal Civil Jury Instructions of the Seventh Circuit 13.5.3 (2017) ("laches, acquiescence, and other equitable defenses to trademark infringement actions" are issues for the court, not the jury).

### a.    Standard

The Court begins by considering the proper standard for this defense.  The Seventh Circuit applies the same three-part test to determine whether a trademark owner impliedly consented to or acquiesced in another party's use of its mark.  *See Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 941 (7th Cir. 2016) (stating the test for acquiescence); *Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 539–40 (7th Cir. 2017) (indicating that the test for acquiescence applies to implied consent and treating the defenses as identical).  To prove acquiescence, the ICE Licensees must show that (1) CME "actively represented that it would not assert a right or claim," (2) CME's "delay between the active representation and assertion of the right or claim was not excusable," and (3) "the delay caused the defendant[s] undue prejudice."  *Hyson USA*, 821 F.3d at 941 (citation omitted).  A trademark owner can convey an active

---

implied licenses.  The Court assumes for purposes of discussion that they have cross-moved for summary judgment, but this does not change the outcome.

representation through its "words or conduct." *Id.* at 940.[6]  The parties dispute only the active representation element.

Citing *All Star Championship Racing, Inc. v. O'Reilly Automotive Stores, Inc.*, 940 F. Supp. 2d 850 (C.D. Ill. 2013), the ICE Licensees argue that they need not prove active representation.  The court in *All Star* stated that "the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license." *Id.* at 863 (quoting *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995)).  In *All Star*, the plaintiff brought a breach of contract action against a trademark owner, who counterclaimed for trademark infringement and other claims.  *All Star Championship Racing*, 940 F. Supp. 2d at 856, 858.  The parties had entered into agreements that set out the plaintiff's obligations in using the defendant's marks but did not expressly license the marks to the plaintiff.  *Id.* at 863.  During the contested time period, the parties entered into subsequent agreements that included additional, express licensing terms, but those agreements were not binding because the defendant had not signed them.  *Id.* at 857, 863.  The plaintiff contended that it had the defendant's implied consent to use the marks and that, during part of the contested period, the defendant had provided the plaintiff with promotional items and approved all its promotions and advertisements.  *Id.* at 864.  In denying summary judgment with respect

---

[6] The Court notes that the affirmative defense of laches is similar to that of acquiescence, but "acquiescence implies active consent," whereas "laches denotes a merely passive consent." *Hyson USA*, 821 F.3d at 940.  Because neither party addressed the laches defense with respect to the defendants' conduct after the termination of the agreements, and because the defendants cite no case law relating to laches or suggesting that they have invoked the defense of laches in their contention there was an implied license, the Court need not address it. *See id.* ("[A]lthough our cases sometimes blend the doctrines of acquiescence and laches, they are formally distinct and should be analyzed separately.").

to the plaintiff's infringement claim for that time period, the court found that the plaintiff had an implied license to use the marks and that there was a genuine factual dispute regarding whether that implied license continued until the date on which the defendant sent the plaintiff a cease-and-desist letter. *See id.* at 864–65.

*All Star* does not support the ICE Licensees' contention that courts analyze the use of a trademark through an implied license differently from the way in which they analyze acquiescence. Although the court in *All Star* found the existence of an implied license, it did not indicate that it based that finding on a doctrine distinct from acquiescence (or, for that matter, implied consent). Indeed, the court entitled the section where it discussed the issue of an implied license "Consent and authorization," *id.* at 862, which suggests that it considered the issue as involving implied consent. And it discussed aspects of the trademark owner's actions—its provision of promotional materials to, and approval of promotions and advertisements by, the plaintiff—that appear analogous to active representations, as they indicated to the plaintiff that it could use the marks. *See id.* at 864. The fact that the court did not call these "active representations" does not matter; the Seventh Circuit had not yet articulated the standard for acquiescence or implied consent. *See Hyson USA*, 821 F.3d at 941 (adopting the three-factor test for acquiescence and stating that the Circuit's prior cases "engage in essentially the same analysis (though without listing elements)"). Further, the other case to which the ICE Licensees cite to suggest that the standard for implied licenses is distinct from that of acquiescence is inapposite because it involved patents, not trademarks. *See Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997).

13

The Court concludes that the standard that applies to the defenses of implied consent and acquiescence is the one that governs the defense that the ICE Licensees frame as estoppel by implied license. Regardless, in order to fully address the ICE Licensees' arguments, the Court will also discuss the standard they propose. The Court considers the application of the defenses (to the extent they constitute separate defenses) for three separate time periods.

### b.    June and July 2017 to August 10, 2017

The Court first considers whether CME acquiesced in the ICE Licensees' uses of the SPAN marks from June and July 2017, when the license agreements expired, through August 10, 2017, when CME sent to ICE the cease-and-desist letter. The ICE Licensees argue that CME acquiesced in their uses of the mark or gave them an implied license to use the mark because it continued to perform its obligations under the license agreements and did not indicate that the ICE Licensees lacked its consent to uses the marks. Specifically, they point to testimony from CME's Rule 30(b)(6) witness that, upon the termination of a license agreement, CME would stop publishing the licensee's data, and its software would no longer support the licensee's product. It is undisputed that, during this timeframe, CME continued to make available to third parties the ICE Licensees' risk array files on its FTP site (although the parties dispute whether CME or the ICE Licensees published the files) and its software continued to support the ICE Licensees' services. It is further undisputed that CME did not notify the ICE Licensees regarding the termination of their agreements until August 10, 2017. The ICE Licensees contend that CME's conduct is indicative that it considered the licenses to remain operative.

CME contends that there can be no acquiescence or grant of an implied license during this timeframe because the parties had always governed their relationship through written agreements. It points to the provision in the license agreements stating that the agreements may be amended only in writing. Without citing to authority, CME also contends that the ICE Licensees could not have understood CME's actions to constitute the conveyance of implied licenses or acquiescence because they were unaware that the licenses had terminated in the first place.

The Court concludes that there is a genuine factual dispute regarding whether CME acquiesced to the ICE Licensees' uses of the SPAN mark (or, as the defendants put it, granted the ICE Licensees implied licenses) from the time of termination of the agreements in June and July 2017 until August 10, 2017. The Court therefore denies both sides' motions for summary judgment on this defense with respect to that time period.[7]

### c.    August 10, 2017 to February 23, 2018

The Court next considers whether CME acquiesced in the ICE Licensees' uses of the SPAN mark from August 10, 2017, when CME sent to ICE the cease-and-desist letter, until February 23, 2018, when CME filed this lawsuit. The defendants argue that, during this time period, CME actively represented to them that it would not assert a right or claim. Specifically, they contend that the letter from CME's in-house counsel Kelly indicated that CME required them to cease using the SPAN mark only if they did not

---

[7] Even if the defendants ultimately establish their acquiescence defense, CME's claim could "be revived" if it "can show that 'inevitable confusion' would result from dual use of the marks." *Hyson USA*, 821 F.3d at 941 (citation omitted). Because neither party raises this issue, the Court need not address it here.

enter into new license agreements; Kelly promised to send to ICE new license agreements; and he approved of their uses of the mark until they entered into the new agreements. CME contends that the ICE Licensees cannot claim CME acquiesced because they did not know that Kelly had sent the letter to ICE or even that the agreements had ended. CME also contends that it provided no active representations that the ICE Licensees or ICE could continue to use its mark and, to the contrary, indicated that the defendants could use the mark only if the parties signed new, written license agreements.

As an initial matter, the ICE Licensees may be able to sustain an acquiescence defense despite their claimed lack of knowledge of the cease-and-desist letter or the termination of the agreements. Notice to a parent company is generally imputed to its subsidiaries, particularly where there is some interrelationship between the entities. *See Woods v. Indiana Univ.-Purdue Univ. at Indianapolis*, 996 F.2d 880, 894 n. 9 (7th Cir.1993) (Rovner, J., concurring); *Norton v. Int'l Harvester Co.*, 627 F.2d 18, 21 (7th Cir.1980). Here, ICE is the parent company, and the ICE Licensees are among its subsidiaries. ICE's general counsel, Short, had authority to enter into agreements on behalf its subsidiaries. He responded to Kelly's letter on the ICE Licensees' behalf and negotiated terms, such as disclosures, for their potential new license agreements. The ICE Licensees had their own general counsels, but they indirectly reported to Short. This is sufficient evidence of an interrelationship between the parent and its subsidiaries such that ICE's notice of the cease-and-desist letter and the agreements' termination can be imputed to the ICE Licensees.

Kelly's letter, however, did not constitute an active representation giving the

16

defendants the rights to use the SPAN mark. Kelly wrote that ICE's general counsel should contact him if ICE was "interested in discussing new licensing agreements with CME" and that, before entering into a "new" agreement, "ICE must demonstrate its good faith efforts to cease the misuse of CME's SPAN® brand." Pls.' L.R. 56.1 Stmt., Ex. 16, dkt. no. 165-18, at 3. Those statements do not suggest that the defendants could continue using the SPAN mark while the parties negotiated new agreements, as the defendants contend. To be sure, a couple of sentences in the letter described, in the present tense, CME's expectation that the defendants comply with their obligations under the agreements—phrasing that, if considered by itself, might imply that the parties' obligations were ongoing. But these sentences did not stand alone; they were part of a larger communication. Considering the entire letter, and particularly its statements that the license agreements had terminated and that the defendants must cease all uses of the SPAN mark unless the parties entered into new agreements, it is clear that no reasonable finding could be made that Kelly was indicating that the defendants had rights to use the mark in the interim.

Another case from this district, *Sarkis' Cafe*, is instructive regarding whether CME actively represented that the defendants had rights to use its mark. In *Sarkis' Cafe*, the court denied the plaintiff's acquiescence defense where the parties had taken "many steps . . . to formalize a franchising agreement" but "the negotiations came to a halt." *Sarkis' Cafe*, 2016 WL 723135, at *4–5. The parties had never had a previous agreement. *See id.* at *1. The plaintiff operated a restaurant, and there was evidence that its manager had trained the defendant's employees and acknowledged the defendant's restaurant as a franchisee in a media interview while they negotiated an

agreement. *Id.* at *4. The court found that "the negotiations cast a shadow over all of [the plaintiff's] actions" and thus none of those actions could "be taken as an affirmative word or deed conveying to [the defendant] a right to use the trademarks." *Id.* at *5.

None of CME's communications with ICE affirmatively indicated that the ICE Licensees could continue using its mark. Specifically, Kelly never stated that the defendants could continue using CME's mark or approved of their continued uses of it. Rather, he repeatedly indicated that CME would propose (and the defendants would need to accept) new financial terms before they could enter into new agreements. But he never got to the point of providing new proposed terms. And he told ICE's general counsel that the parties needed to agree on new disclaimers regarding the defendants' uses of the mark. Although Kelly stated that ICE's proposed disclaimers "look[ed] good," Defs.' L.R. 56.1 Stmt., dkt. no. 188, ¶ 340, he never told ICE that it could implement those disclaimers and use the mark.

There is, however, a genuine factual dispute regarding whether CME's conduct during the negotiations served as an active representation that the defendants could use the licenses. Specifically, the defendants contend that CME's continued performance of its obligations under the license agreements showed that the ICE Licensees had CME's permission to use the SPAN marks. As indicated, a trademark holder can convey an affirmative representation through its conduct, not just its words. *Hyson USA*, 821 F.3d at 941. Unlike the parties in *Sarkis' Cafe*, who previously had never entered into license agreements, CME and the ICE Licensees had had ten-year license agreements. Thus the lens through which the defendants would see CME's conduct differs from the negotiation for an initial license involved in *Sarkis' Cafe*. After

18

the terminations of the ICE Licensees' agreements, while CME and ICE were negotiating over new agreements, CME continued to make available on its FTP site the ICE Licenses' risk array files and issued a notice to its clearing members that it planned to migrate the site, including data for ICE's clearinghouses, to a new host. (The parties dispute whether CME or the ICE Licensees posted the files to the FTP site.) The Court cannot determine without hearing testimony whether CME's conduct amounted to an active representation that the defendants could use the SPAN mark. Accordingly, CME is not entitled to summary judgment on the defense for the period from August 10, 2017 through February 23, 2018.

Turning to the defendants' motion, CME's claimed silence during the negotiations does not entitle defendants to summary judgment on their defense, as the defendants contend. In certain situations, a trademark owner's continued silence may constitute an active representation indicating its acquiescence in another party's use of its mark. *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). In *ProFitness*, a trademark holder sent a cease-and-desist letter to its competitor, with whom it had never entered a license agreement. *Id.* at 65. The competitor ameliorated the effect of the letter by making a good faith proposal to change its allegedly infringing use and expressly requesting that the trademark holder respond to its proposal, with the caveat that the failure to respond would be construed as assent. *Id.* at 65–66. The trademark holder never responded. *Id.* at 66. The court found that, under the circumstances, the trademark holder's silence amounted to an active representation, and the competitor reasonably believed the holder had acquiesced in its use of the mark. *See id.* at 68–69. This case, however, is

19

distinguishable from *ProFitness* because the defendants never requested CME's consent to continue their uses of its mark or told CME that they would interpret its silence as consent. The existence of the parties' prior written licensing arrangement further serves to distinguish this case from *Pro Fitness.* Accordingly, to the extent the defendants contend that the doctrine of estoppel by an implied license is distinct from the doctrines of acquiescence or implied consent, there is evidence that would permit a finding that they had implied licenses during this timeframe and evidence that would permit the opposite finding.

### d.     After February 23, 2018

CME argues that the ICE Licensees can point to no evidence showing acquiescence and/or grants of implied license after CME filed this lawsuit on February 23, 2018. The defendants argue that the parties' conduct after CME filed the lawsuit indicated that CME gave implied licenses or acquiesced in their use of the mark. That argument makes no sense. A trademark owner cannot be considered to have actively represented that it will not assert a claim against former licensees and their parent company for their uses of its mark—as required for the defense of acquiescence—when it already has asserted exactly such a claim. *See* Restatement (Third) of Unfair Competition § 29 cmt. d (Am. Law. Inst. 1995) (the commencement of an infringement action indicates that a trademark owner does not consent to the allegedly infringing party's use of its mark). The Court need not address the other two elements of an acquiescence because they "cannot alone support a finding of acquiescence." *Hyson USA*, 821 F.3d at 941. And even if, as the ICE Licensees contend, the active representation requirement does not apply, no jury could find that the defendants

reasonably believed that CME had given them an implied license to use the mark once it had already sued them for use of the mark. Therefore, the Court grants CME's motion for summary judgment, and denies the defendants' cross-motion, on the defenses of acquiescence and/or estoppel by implied license as they pertain to the ICE Licensees' uses of the mark after February 23, 2018.

### e.    Summary

In sum, the Court grants CME's motion for summary judgment on the defenses of acquiescence and/or estoppel by implied license for trademark violations occurring after February 23, 2018 but declines to enter summary judgment in CME's favor on these defenses for the periods before that date. The Court denies the defendants' cross-motion for summary judgment on these defenses.

### 4.    Express license

The defendants frame their fourth affirmative defense as a defense that any infringement was permitted under express or implied licenses. CME stated in its opening brief that it presumed that the defense related only to the existence of implied licenses through acquiescence. It thus moved for summary judgment on that defense as to the ICE Licensees based only on the issue of acquiescence, as the Court just addressed. In its reply brief, however, CME sought summary judgment on the express license defense. The defendants contend that CME waived that argument by failing to make it in its opening brief and, regardless, that its express license defense applies only to ICE.

A court is entitled to find that an argument raised for the first time in a reply brief is forfeited. *See, e.g.*, *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). CME

waived its argument for summary judgment on an express license defense by failing to make that argument. That said, the ICE Licensees conceded their express license defense by arguing that they had no express license. Accordingly, the Court finds that an express license defense is still at issue in this case only as it pertains to ICE, and neither party has moved for summary judgment on that issue.

**B.    Trademark-related claims**

CME asserts claims against all of the defendants for trademark counterfeiting and infringement under 15 U.S.C. § 1114 and unfair competition under 15 U.S.C. § 1125(a), as well as parallel state law claims.[8]  ICE has raised counterclaims challenging the protectability of the SPAN mark, as indicated. CME has moved for summary judgment on its claims against the ICE Licensees but not against ICE. The defendants have all cross-moved for summary judgment on CME's claims and certain counterclaims. Specifically, ICE seeks summary judgment on its counterclaims, and, with respect to CME's claims, all of the defendants argue that CME alleged no facts relating to trademark violations during the terms of the agreements and failed to prove violations after the agreements' termination.

The Court first addresses the issue of protectability. After that, the Court will turn to whether CME alleged facts relating to trademark violations during the terms of the license agreements. Next, the Court will discuss most of the trademark claims relating

---

[8] CME alleges deceptive trade practices in violation of 815 Ill. Comp. Stat. 510/1 and unfair competition in violation of Illinois common law. Both claims are subject to the same standards as the federal infringement claims. *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 619 (7th Cir. 1993); *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1173 n.9, 1174 (7th Cir. 1986). Thus the Court need not engage in a separate analysis of these claims.

to the defendants' uses of the SPAN mark after the agreements' terminations, and, finally, the Court will discuss the counterfeiting claim, which entails a separate analysis.

### 1.    Protectability

A plaintiff may sue for trademark violations only if its mark is protectable.  *See CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673 (7th Cir. 2001).  ICE has moved for summary judgment on its counterclaims, which challenge the SPAN mark's protectability on the grounds that the mark is generic and that CME has abandoned it through naked licensing.[9]  CME has not cross-moved for summary judgment on either counterclaim.  The ICE Licensees have not challenged the mark's validity in the present motion; the doctrine of licensee estoppel precludes them from doing that.[10]  *See Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 657 (7th Cir.1965) (trademark licensees are estopped from disputing protectability); *Chrysler Motors Corp. v. Alloy Auto. Co.*, 661 F. Supp. 191, 193 (N.D. Ill. 1987) (former licensees are estopped from challenging protectability except based on facts arising after the licenses' terminations).  The Court addresses genericness first and then discusses abandonment.

---

[9] ICE also asserts affirmative defenses relating to these counterclaims.  The Court need not address those defenses separately because the analysis is the same regardless of whether they are framed as counterclaims or defenses.

[10] The ICE Licensees challenged the mark's validity in their initial counterclaims and CME moved to dismiss those counterclaims due to licensee estoppel.  CME contends in its opening brief that the Court granted that motion and dismissed the ICE Licensee's counterclaims due to licensee estoppel, but that does not appear to be correct.  The Court did not grant that motion to dismiss.  Rather, at a hearing on May 17, 2018, the Court instructed the defendants to file a response to the motion to dismiss addressing the issue of licensee estoppel, and the defendants indicated that they instead would amend their answer and counterclaims.  The defendants amended the counterclaim so that only ICE raised the validity counterclaims, dkt. no. 41, and the Court terminated CME's motion to dismiss after CME filed an amended complaint, *see* dkts. no. 69, 74.

### a. Genericness

ICE has moved for summary judgment on its counterclaim alleging that SPAN has become a generic term referring to the calculation of initial margin and thus CME's mark is not legally protectable. "The term 'trademark' includes any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. "Marks are classified into five categories of increasing distinctiveness: 1) generic, 2) descriptive, 3) suggestive, 4) arbitrary, and 5) fanciful." *Mil-Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996). "[G]eneric terms receive no trademark protection." *Id.*

A generic term is one that is "commonly used to name or designate a kind of goods," whereas a trademark "identifies the source of a product." *Id.* at 1157 (citation omitted). A determination that a trademark is generic is a "fateful step" that "penalizes the trademark's owner" for successfully "making the trademark a household name" and that "may confuse consumers who continue to associate the trademark with the owner's brand." *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 531 (7th Cir. 2003). Courts thus generally find that a trademark has become generic only where "the trademark has gone so far toward becoming the exclusive descriptor of [a] product that sellers of competing brands cannot compete effectively without using the name to designate the product they are selling." *Id.* Otherwise, if such words were considered protectable trademarks, sellers would be in a "pickle," as the Seventh Circuit has stated, because they would be "forbidden to use 'brassiere,' 'cellophane,' 'escalator,' 'thermos,' 'yo-yo,' or 'dry ice' to denote products—all being former trademarks that have become generic

terms." *Id.* at 531–32.

Genericness is a question of fact. *See, e.g.*, *id.* at 530–31. The registration of a trademark under the Lanham Act affords the registrant a rebuttable presumption of validity. *See* 15 U.S.C. § 1115(a); *CAE*, 267 F.3d at 673. The Seventh Circuit has not directly addressed which party bears the burden of persuasion regarding the genericness of an incontestable mark. *Compare TE-TA-MA Truth Found.-Family of URI, Inc. v. World Church of the Creator*, 297 F.3d 662, 665 (7th Cir. 2002) (stating, without discussing which party bears the ultimate burden of persuasion, that "an incontestable registration is more like a bursting-bubble presumption of non-generic-ness than like [an] indomitable presumption") *with Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1135 (9th Cir. 2006) (defendant has the burden of showing the genericness of an incontestable mark). As previously explained in *Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F. Supp. 2d 789 (N.D. Ill. 2007) (Kennelly, J.), this Court assumes the defendant bears the burden of persuasion on an incontestable trademark's genericness. *See id.* at 793; *see also Illinois Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2018 WL 1534971, at *3 (N.D. Ill. Mar. 29, 2018) (Kennelly, J.).

The types of evidence relevant to a determination of genericness include consumer surveys, dictionary definitions, and the uses of the term by the trademark owner, its competitors, and the media. *See*, *e.g.*, McCarthy, *supra*, § 12:13. ICE contends that SPAN is generic based on survey results, a financial dictionary's definition, and uses of the term by CME, its competitors, the media, and academics. Viewing the evidence in the light most favorable to CME, the nonmoving party, there is a genuine factual dispute regarding whether the term is generic. For each category of

25

evidence, the Court first addresses issues of admissibility and then describes the admissible evidence put forth by the parties. Finally, the Court explains why, considering all of the evidence, there is a genuine factual dispute.

### i. Survey results

Surveys can provide evidence of genericness, but a party is not required to conduct a survey to establish that a disputed term is or is not generic. *See id.* § 12:14. ICE has presented a survey conducted by its retained expert witness, Phillip Johnson. CME has presented no survey of its own and challenges the admissibility and results of ICE's survey.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). The party "seeking to introduce the expert witness testimony bears the burden of demonstrating," by a preponderance of the evidence, that the testimony is admissible. *Id.* at 782. Expert testimony is admissible if the witness is qualified, applies reliable methodology, and renders testimony that will assist the trier of fact. *Id.* at 779. In considering the question of methodological reliability, the Court must take a "flexible" approach based on "the precise sort of testimony at issue and not any fixed evaluative factors." *Id.* at 780.

CME challenges the reliability of Johnson's survey on several grounds. First, CME argues that Johnson employed an unreliable methodology because, it contends, he surveyed an over- and underinclusive universe of respondents. The proper universe for a consumer survey on genericness is "the segment of the population

26

whose perceptions and state of mind are relevant to the issues in [the] case."
McCarthy, *supra*, § 32:159. If a survey's universe is "sufficiently precise," it is
admissible, and any inadequacies in the scope of its universe go to the weight to be
given to its results. *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930 (7th Cir.
1984). In *Piper Aircraft*, the Seventh Circuit found that a survey about the genericness
of airplane parts was admissible where it included all owners of private airplanes, rather
than only airplane owners likely to buy parts because they "work on, restore, or build
their own aircraft." *Id.* Although the court found that the survey was somewhat
overinclusive, it found that the views of all private airplane owners nonetheless were
relevant because they had a "substantial interest in the quality of parts used in their
planes." *Id.* The court found that the lesser probative value of the views of airplane
owners who do not work on their own planes would affect only the weight to be given
the survey, not its admissibility. *Id.* at 930–31.

CME contends that the survey's universe was underinclusive because it did not
include all people who purchase financial risk management services or use those
services to calculate initial margins and overinclusive because it included people who
do not purchase or use those services. ICE's expert surveyed finance professionals
who have Series 3 licenses (which qualifies them to trade commodities) and who are
involved in commodity futures trading. Johnson testified that he selected this universe
because people with such licenses are the "end users" of SPAN and are "subject to the
SPAN calculation for the margin requirements on the trades that they make." Defs.'
Add'l L.R. 56.1 Stmt., dkt. no. 181-6, ¶¶ 111–12. CME contends that, although traders
may be subject to margin requirements, those who are tasked with purchasing risk

27

management services or calculating initial margins may not engage in trading and thus may not have Series 3 licenses. In support of this contention, CME's rebuttal expert reviewed job descriptions for risk management positions on job-search websites and the parties' websites and concluded that they generally do not require applicants to hold Series 3 licenses. He also examined the profiles of SPAN licensees' employees on a brokerage website and found that the profiles did not indicate that they held Series 3 licenses.

Johnson's survey was underinclusive to the extent that it may have excluded people who buy risk management services or calculate initial margins. The survey also was somewhat overinclusive. Although the views of people with Series 3 licenses are relevant regarding whether SPAN is a generic term because traders have a "substantial interest" in initial margins calculated through the SPAN framework, the views of people who buy or use risk management services but do not hold Series 3 licenses are also relevant. *See Piper Aircraft*, 741 F.2d at 930; *see also Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 5612340, at *18 (N.D. Ill. Sept. 22, 2015) (survey was overinclusive where it did not specify whether respondents who used a product were likely to purchase it). The universe, however, is not so "significantly skewed away from the proper group of people whose perception is at issue" as to render it unreliable and thus inadmissible. McCarthy, *supra*, § 32:159. Therefore, the survey is admissible; the objection affects only its weight.

CME contends that other aspects of Johnson's survey make its results unreliable. Specifically, because the survey defined brand names as names that can be used by only one company, CME argues that the survey could have caused respondents to

28

misunderstand that trademarks can be used by multiple companies due to licensing arrangements. Citing *Sheetz of Delaware, Inc. v. Doctors Associates Inc.*, 108 U.S.P.Q.2d 1341 (T.T.A.B. 2013), ICE responds that courts have approved of similar definitions of brand names in other cases. But *Sheetz* is not on point; the administrative agency in that case did not address whether the definition at issue sufficed to distinguish between brand names used by multiple companies under license agreements. *See id.* at 1365. ICE also asserts that respondents took screening questions to ensure they could differentiate between brand names and generic terms, but there is no evidence indicating whether the screening questions involved terms used by multiple companies through license agreements.

A survey's questions and instructions "should not be slanted or leading so as to lead the respondent to a desired response." McCarthy, *supra*, § 32:172. In this case, the survey's definition of brand names could be confusing or slanted in that it suggested that only one company can use the term SPAN. This issue is somewhat mitigated, however, because respondents who were confused by the definition could indicate that they did not know whether SPAN was generic or not. *See Black & Decker*, 2015 WL 5612340, at *19 (the leading nature of a survey question can be somewhat mitigated where respondents can answer that they do not know the answer to a question). Accordingly, the Court again finds that CME's objection affects only the weight to be given to the survey, not its admissibility.

Additionally, CME argues that Johnson improperly excluded respondents because they had never heard of the term SPAN. CME contends that respondents' unawareness of a term is an indication that the term is not generic. This argument

29

misses the mark. The relevant question for genericness is not whether respondents are aware of the term but, rather, whether people who are aware of a product commonly use the term to "name or designate" it. *See Mil-Mar Shoe*, 75 F.3d at 1157.

CME also argues that the survey's results are unreliable because Johnson did not include all respondents in his conclusions but rather included only the respondents who had heard of the term SPAN. But this argument effectively challenges how Johnson framed the results, not the reliability of his methodology. *Gopalratnam*, 877 F.3d at 781 (Rule 702 requires only an that an expert correctly apply "a reliable *methodology*," not that his conclusions are reliable). To the extent CME challenges Johnson's results or ICE's framing of the results, that goes to the survey's weight and is not grounds for excluding the survey. *See id.*

Accordingly, the Court concludes that Johnson's survey is admissible. Johnson found that sixty-nine percent of the respondents who had seen or heard of the term SPAN believed it to be a common name, twenty-nine percent believed it to be a brand name, and two percent did not know whether it was a common or brand name. Defs.' L.R. 56.1 Stmt., Ex. 87, dkt. no. 181-6, at 233. But around twenty-seven percent of the respondents had never heard of the term SPAN. *See* Pls.' Add'l L.R. 56.1 Stmt., Ex. 18, dkt. no. 195-4, at 36. Although Johnson's survey provides support for ICE's claim of genericness, a jury might discount it for the reasons the Court has discussed. It is not conclusive evidence of genericness.

### ii.    Dictionary definition

Courts often look to dictionaries as a source of evidence on genericness because "generic use implies use consistent with common understanding." *Mil-Mar Shoe*, 75

F.3d at 1158. The term SPAN is not included in standard dictionaries. Investopedia, a website with an online financial dictionary, defines SPAN without referencing CME. ICE contends Investopedia's definition supports summary judgment on the issue of genericness. But another article on Investopedia attributes to SPAN methodology to CME. Again, the defendants' dictionary citation does not amount to conclusive evidence of genericness.

### iii. Uses of the term

ICE also argues that usage of the term SPAN by CME, its competitors, the media, and academics indicate that the term is generic. Specifically, ICE points to evidence that CME recently started using the phrase "CME SPAN" to distinguish itself from other common references to the term. It also contends that CME uses SPAN as a noun, in the possessive form, and without the trademark symbol—uses that ICE contends show that the term is generic. It offers evidence from an expert, Robert Frank, who examined the uses of SPAN in media and Internet sources and concluded that the majority of those sources used the term SPAN as a noun, did not identify it as a trademark, and mentioned CME only to indicate that it invented the term. And it argues that CME failed to police third parties' uses of its mark, which it contends indicates that the mark has become generic.

As an initial matter, CME challenges the admissibility of Frank's expert report. As indicated, expert testimony is admissible if the witness is qualified, applies reliable methodology, and renders testimony that will assist the trier of fact. *Gopalratnam*, 877 F.3d at 779. CME challenges only the reliability of Frank's methodology. Because the Court serves a gatekeeping role rather than a factfinding one, its inquiry into the

question of methodological reliability inquiry is limited to an expert's "principles and methodology, not the conclusions that [he] generate[s]." *Id.* at 781 (quoting *Daubert*, 509 U.S. at 595).

CME contends that Frank's testimony is not reliable because, according to its two rebuttal experts, Frank overcounted the number of references to SPAN, ignored the context in which the mark was used, and improperly included references that are inapplicable to this case. Notably, CME does not object to the design of Frank's searches for articles referencing the term SPAN or to the nature of the news and academic articles on which he based his analysis. Instead, CME's objections relate to the conclusions that Frank drew and how he reached those conclusions, which go to only the weight to be given to his testimony, not to its reliability or admissibility. *See id.* The Court denies CME's request to bar Frank's testimony.

ICE, in turn, challenges the admissibility of CME's expert testimony as improper rebuttal evidence. According to ICE, CME's experts, David Gooder and Dr. Robert Leonard, responded to Frank's testimony by offering express opinions about the genericness of the SPAN mark, even though Frank never provided a conclusion on the mark's genericness. ICE further challenges the reliability of Gooder's expert opinion because, it contends, he provided improper legal analysis. The Court need not address the admissibility of Gooder's or Dr. Leonard's testimony, however, because their opinions do not affect the outcome of this decision. In particular, as the Court explains momentarily, even without these expert opinions, there is not enough evidence for summary judgment in favor of ICE.

Through its expert, ICE has offered evidence that CME, the media, and

academics used the SPAN mark as a noun, without a trademark symbol, and in contexts indicating it was generic. But ICE's expert also identified the existence of instances where CME, the media, and academics used the SPAN mark as a trademark. And although ICE contends that CME failed to police the uses of its mark, ICE does not point to conclusive proof that they never policed the mark and, regardless, a trademark holder's failure to police the uses of its mark can, but does not always, indicate genericness. *See* McCarthy, *supra*, § 17:8.

### iv. Conclusion

In sum, viewing the evidence, taken as a whole, in the light most favorable to CME, there is a genuine factual dispute regarding the genericness of the SPAN mark. Specifically, a reasonable jury could find that Johnson's survey provides support for ICE's claim of genericness, as the Court has discussed, but a reasonable jury could also reach the opposite conclusion. And to the extent Investopedia is considered an authoritative dictionary (an issue the Court need not decide), a reasonable jury could take its definition of SPAN as evidence of genericness or, considering Investopedia's article attributing the SPAN methodology to CME, as just the opposite. Nor does ICE's evidence of uses of the term SPAN provide conclusive evidence of genericness, as just discussed. In short, the evidence is not "so one-sided that there can be no doubt about how" a jury would answer the question of genericness, and thus summary judgment on that issue is inappropriate. *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir. 1996). The Court therefore denies ICE's motion for summary judgment on the counterclaim relating to genericness.

### b.    Abandonment through naked licensing

ICE has also moved for summary judgment on its counterclaim that CME's trademark is invalid because it abandoned its rights in the mark through naked licensing.  Abandonment through naked licensing occurs when a trademark owner allows "others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee.'"  *Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 789 (7th Cir. 2011) (alteration in original) (quoting Restatement (Third) of Unfair Competition § 33).  A party contending that a trademark owner engaged in naked licensing bears a "heavy burden."  *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997) (quoting Restatement (Third) of Unfair Competition § 33 cmt. c).

In making naked licensing determinations, the Seventh Circuit "tend[s] towards the view taken by the Restatement (Third) of Unfair Competition, which advocates a flexible approach but allows licensors to rely at least somewhat on the reputation and expertise of licensees."  *Id.*  Under that approach, if the trademark owner has a justification for relying on the licensee's reputation and expertise, "the existence of contractual obligations undertaken by the licensee may be sufficient in itself to constitute reasonable quality control . . . at least in the absence of evidence indicating significant deviations from the agreed standards or procedures."  Restatement (Third) of Unfair Competition § 33 cmt. c.  But more quality control may be necessary "if the licensee is inexperienced, or if the goods or services are particularly complex or otherwise require careful supervision, or if the risk to the public from inadequate supervision is substantial."  *Id.  See also Bodum USA, Inc. v. A Top New Casting, Inc.*,

34

No. 16 C 2916, 2017 WL 1927701, at *3 (N.D. Ill. May 10, 2017) (Kennelly, J.) (declining to grant summary judgment on the issue of naked licensing where there was no evidence that a trademark owner was unjustified in relying on a licensee's expertise and fulfillment of its contractual obligations and no evidence of a deviation in the licensed products' quality).

ICE argues that CME failed to exercise reasonable quality control because it never exercised its contractual rights to control the goods or services related to its licenses. Specifically, ICE contends that CME provided licensees with few guidelines apart from the obligations set forth in license agreements regarding its standards for their services; had no approval or product accreditation process for licensees' services; would review licensees' services only at the start or end of their licenses' terms; never terminated a license agreement due to a licensee's quality of services; and never audited any licensee's services, advertisements, or software codes relating to the SPAN framework. CME contends that it exercised quality control through a six-month onboarding process for licensees (a process ICE contends is optional) and its role in helping to implement and validate licensees' software (another matter that ICE disputes). CME also points to the enforcement actions it took against ICE and the ICE Licensees in 2009 and 2017, but those actions are irrelevant regarding the issue of quality control because, in taking them, CME sought to address the ICE Licensees' uses of the mark, not to control the quality of their services. *See Slep-Tone Entm't Corp. v. Coyne*, 141 F. Supp. 3d 813, 824 (N.D. Ill. 2015) ("The 'control' required . . . is not control over the mark, but rather control over the *service* that the mark identifies.").

A reasonable jury, however, could find that CME did not need to exercise its

contractual rights to exercise reasonable quality control. ICE compares this case to *Eva's Bridal*, an "extreme case" in which the Seventh Circuit found that a trademark holder had abandoned its license because neither its license agreement nor its "course of performance" indicated that it held or exercised any authority over its licensee. *Eva's Bridal*, 639 F.3d at 790–91. But unlike in *Eva's Bridal*, the license agreements granted CME the right to control the nature and quality of the ICE Licensees' services, perform inspections, and require the ICE Licensees to modify their SPAN-related systems in order to conform with its specifications. Because CME's licensees include sophisticated financial institutions such as clearinghouses and exchanges that are subject to federal regulation and have significant incentives to maintain the quality of CME's SPAN framework, a reasonable jury could find that CME was justified in relying on its licensees' reputations and expertise, absent a "significant deviation from" CME's quality standards. *See TMT N. Am.*, 124 F.3d at 886. If the licensees' services significantly deviated from the quality of the SPAN framework, they could have faced regulatory, financial, and reputational consequences.

That said, there is a genuine factual dispute regarding whether licensees' uses of SPAN involved significant deviation from CME's quality standards. CME permitted licensees to develop their own implementations of the SPAN framework, which a reasonable jury could find entailed significant deviations from CME's standards. For example, as indicated, a CME employee involved in product management wrote in an e-mail that CME chose to "ignore" unilateral changes that the ICE Licensees made to the SPAN algorithm, which caused their calculations to "deviate." Defs.' L.R. 56.1 Stmt., Ex. 73, dkt. no. 181-6, at 131–32. And an employee wrote that London Clearing House,

36

another licensee of the SPAN mark, "changed the methodology that is native to SPAN." *Id.* at 131. But a reasonable jury also could find that the implementations did not constitute significant deviations. In a subsequent e-mail, an employee stated that the London Clearing House "might not have made any actual changes" to the algorithm for SPAN; he appeared to indicate that the changes could have been related to the functionality of software and may not have a major impact on the underlying methodology. *Id.* at 130.

The Court concludes that there is a genuine factual dispute regarding whether CME failed to exercise adequate quality control and thereby engaged in naked licensing. Therefore, the Court denies ICE's motion for summary judgment on its counterclaim of abandonment through naked licensing.

Because the Court denies ICE's motion for summary judgment with respect to both validity counterclaims, it need not address ICE's request for cancellation of CME's four trademark registrations relating to the SPAN framework.

### 2. Trademark violations during the terms of the license agreements

Assuming CME can prove at trial that its mark was protectable, it must also prove the other elements of its claims for trademark counterfeiting and infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. § 1125(a), and parallel state law violations. As indicated, CME has moved for summary judgment against the ICE Licensees on these claims as they pertain to CME's liability, and the defendants have cross-moved for summary judgment.

CME argues that the ICE Licensees infringed the SPAN mark during the terms of the license agreements by using the phrase "ICE SPAN," a use of the SPAN mark it

contends that the agreements did not permit. The defendants contend that they cannot be liable for trademark violations during the terms of the agreements because CME did not plead any facts to support this theory.

At the summary judgment stage, a plaintiff typically can assert new legal theories, but it cannot change the factual basis of its complaint. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018). "Such an alteration would be an unacceptable attempt to amend the pleadings through summary judgment argument." *Id.* (internal quotation marks and citation omitted). Where a party raises a new argument in the course of summary judgment briefing that changes the factual theory set forth in the complaint, a "district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims." *Id.* at 540 (citation omitted). In exercising that discretion, "the court should consider the consequences of allowing the plaintiff's new theory"; where the amendment would "cause unreasonable delay, or make it more costly or difficult to defend the suit, the district court can and should hold the plaintiff to [its] original theory." *Id.* (internal quotation marks and citation omitted).

CME contends that two sentences in the complaint sufficiently allege that the ICE Licensees infringed the SPAN mark during the term of the license agreements. In those sentences, CME alleges that it determined that the defendants infringed upon its trademark rights, Am. Compl., dkt. no. 69, ¶ 39, and that it had previously contacted or communicated with the ICE Licensees regarding their allegedly infringing uses of the SPAN mark, *id.* ¶ 88. Neither of these allegations nor, for that matter, any other portion of the complaint, contains well-pleaded facts supporting a claim of infringement by ICE

Licensees during the terms of the license agreements.

CME also contends that two exhibits attached to its complaint—printouts from the ICE Licensees' websites, totaling over 130 pages, that mention "ICE SPAN" about a dozen times—make clear that CME was alleging infringement by the ICE Licensees during the terms of the license agreements. *See* Am. Compl., Ex. C, dkt. no. 69-2, at 59; *id.*, Ex. D, at 80, 82, 84, 89, 92, 95. The contents of documents attached to a complaint "become part of the complaint" when the plaintiff "references and relies upon" those documents to support its claim. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). CME's exhibits do not support allegations of infringement during the terms of the license agreements. *See* Am. Compl., Ex. C, at 59; *id.*, Ex. D, at 80, 82, 84, 89, 92, 95. Rather, CME's complaint references the exhibits to support facts regarding the ICE Licensees' allegedly infringement uses of the SPAN mark *after* the termination of the license agreements, not before it. *See* Am. Compl. ¶¶ 45–60, 62. And the contents of the exhibits do not clearly relate to allegations of trademark violations during the license agreements' terms. Accordingly, CME's allegations that the ICE Licensees infringed the SPAN mark during the terms of the ICE License agreements constitute a *de facto* amendment to its complaint.

The Court concludes that amendment of CME's complaint to include a claim regarding infringement during the terms of the license agreements factual allegations would cause unreasonable delay and unreasonably increase this lawsuit's costs for the defendants, particularly in light of the substantial discovery the parties have completed (the Court notes that discovery relating to liability is closed). CME's arguments to the contrary fall flat. It contends that the new allegations would not cause an unreasonable

delay or additional expenses because the ICE Licensees were aware of these allegations. Many of CME's citations in support of this proposition relate to the relevant time period addressed in discovery requests, which included periods during and before the parties signed the license agreements, as set out in various reports and motions the parties filed before the Court. *See, e.g.*, Joint Stipulation, dkt. no. 75, ¶ 5; Parties' Joint Report on Discovery, dkt. no. 76, at 3.[11] But the proposition that the relevant time period of discovery put the defendants on notice that CME was asserting a claim involving trademark violations during the term of the license agreements is too much of a stretch. Furthermore, other issues in the case, such as whether CME abandoned the trademark through naked licensing, involve facts from that same timeframe.

As further support for its contention that the defendants were aware of these allegations, CME cites motions, reports, and the defendants' statement of facts regarding the ICE Licensees' uses of the phrase "ICE SPAN" during the term of the agreements. *See, e.g.*, Defs.' L.R. 56.1 Stmt., dkt. no. 188, ¶¶ 145–48, 193–94.[12] But again, because use of that phrase also relates to other issues in this case—such as whether CME engaged in naked licensing—these documents in no way suggest that the ICE Licensees had notice of these new claims.

---

[11] CME has cited to six items on the docket in support of this proposition (as well as to six paragraphs in the defendants' Local Rule 56.1 Statement of Facts that appear to provide support for a different proposition). The Court has cited to the only two relevant items that included pincites. CME also has cited to a nineteen-page motion for a protective order, dkt. no. 51, a five-page motion to compel a deposition, dkt. no. 101, an eleven-page memorandum in support of that motion, dkt. no. 104, and a six-page joint report on discovery, dkt. no. 170—all without pincites. None of the cited documents show that the defendants had notice of the new allegations.

[12] In support of this proposition, the defendants also have cited to six documents described in the previous footnote. Again, none of these documents supports the defendants' contention that the ICE Licensees had notice of the new claims.

For these reasons, the Court declines to approve CME's *de facto* amendment to the complaint. The Court therefore denies CME's motion for summary judgment. The Court disregards defendants' cross-motion for summary judgment regarding the trademark counterfeiting, trademark infringement, unfair competition, and parallel state law violations that CME alleges occurred during the term of the license agreements because "a party cannot obtain summary judgment on a matter not raised by the pleadings." *Roby v. Greenlee Textron, Inc.*, No. 94 C 50294, 1995 WL 767819, at *5 (N.D. Ill. 1995); *see also Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 758 n.15 (7th Cir. 2006).[13]

### 3. Trademark infringement, unfair competition, and parallel state law after the termination of the license agreements

CME next argues that the ICE Licensees committed trademark violations after the termination of the license agreements. A licensee violates trademark law if it continues to use a trademark after the termination of a license agreement. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989). In their cross-motion for summary judgment, the defendants argue that CME has not met its burden to establish that any post-termination uses by the ICE Licensees created a likelihood of confusion. That is incorrect as a matter of law; the use of a trademark after a license agreement's termination by itself establishes a likelihood of confusion, subject to any applicable defenses. *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983) ("[M]any courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and

---

[13] Accordingly, the Court need not address the argument (raised only in the defendants' reply brief) that these claims are barred by the doctrine of laches.

constitutes trademark infringement."); *Ramada Franchise Sys., Inc. v. Royal Vale Hosp. of Cincinnati, Inc.*, No. 02 C 1941, 2005 WL 435263, at *15 (N.D. Ill. Feb. 16, 2005) (collecting cases).

It is undisputed that the ICE Licensees used the SPAN mark after the termination of the license agreements. Specifically, as indicated, ICE Clear US continued to use the phrase "SPAN® Margin Model" in connection with its risk management services, ICE Clear Europe continued to use the word "SPAN" in connection with its services, and both ICE Licensees continued to place disclosures on their materials stating that the SPAN mark was a registered trademark of CME being used pursuant to a license. Pl.'s L.R. 56.1 Stmt., dkt. no. 188, ¶¶ 59–62, 92, 193.

To the extent the defendants suggest that there is no likelihood of confusion between their uses of the phrase "SPAN for ICE" and the SPAN mark, that argument is unavailing. A viewer of the "SPAN for ICE" phrase "would be likely to associate" SPAN's risk management services with CME's risk management services; no reasonable jury could find otherwise. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008) (explaining factors courts consider in addressing the likelihood of confusion); *see CAE*, 267 F.3d at 678, 682 (finding that marks were indistinguishable where both parties used them in combination with the names of the their departments).[14] In particular, a reasonable jury would be required to find that participants in the financial risk services markets likely would confuse the phrase "SPAN

---

[14] Courts generally consider seven factors in addressing a likelihood of confusion. *AutoZone*, 543 F.3d at 929. Because the parties do not address the seven factors, the Court need not address each factor in detail. Regardless, a discussion of all of the factors would lead to the same outcome.

for ICE" with the SPAN mark when the ICE Licensees used the phrase in connection with their risk management services, especially because they indicated that they had licenses from CME to use the mark, had held such licenses in the past, and offered similar products to the same market. *See id.* at 677–87 (analyzing likelihood of confusion between two similar marks and affirming district court's grant of summary judgment on that point). And, regardless, as indicated, there is evidence that the ICE Licensees used the SPAN mark in contexts separate from their uses of the phrase "SPAN for ICE."

Therefore, the Court grants CME's motion for summary judgment, and denies the defendants' cross-motion, on the question of liability on CME's claims of trademark infringement, unfair competition, and parallel state law violations relating to defendants' continued use of the marks following termination of the licenses.

### 4. Counterfeiting after the termination of the license agreements

The Court turns next to CME's trademark counterfeiting claim as it relates to the post-termination period. Though CME has asserted this claim against all of the defendants, it has moved for summary judgment only against the ICE Licensees. The defendants have all cross-moved for summary judgment on this claim.

The Lanham Act forbids the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . of any goods or services [where] such use is likely to cause confusion . . . or to deceive." 15 U.S.C. § 1114(1)(a). It defines a counterfeit mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." *Id.* § 1127; *see also* McCarthy, *supra*, § 25:10 ("Counterfeiting is the act of producing or selling a product with a sham

43

trademark that is an intentional and calculated reproduction of the genuine trademark.").

CME argues that the ICE Licensees engaged in counterfeiting by using the SPAN mark after the license agreements' termination for services that were identical to those covered by the trademark. The defendants contend that they did not engage in counterfeiting because the ICE Licensees identified themselves as the originators of the initial margin services they offered and because they did not use marks that were identical to or substantially indistinguishable from the SPAN mark.

Courts disagree on whether the continued use of a mark by a holdover licensee constitutes counterfeiting. *Id.*; *compare U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997) (holdover franchisee's continued use of a trademark is not counterfeiting) *with State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 722 (9th Cir. 2005) (holdover licensee's continued use of a certification mark constitutes counterfeiting where there is a likelihood of confusion and the mark owner cannot exercise quality control). The Seventh Circuit has not directly addressed the issue, but it has stated that the aim of the Lanham Act's counterfeiting provision is to prohibit the use of a trademark on an unauthorized product, not merely to prohibit literal counterfeiting through reproductions or imitations that deceive customers about the source of a product. *See Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989); *see also Century 21 Real Estate, LLC v. Destiny Real Estate Props.*, No. 4:11-CV-38 JD, 2011 WL 6736060, at *5 (N.D. Ind. Dec. 19, 2011) (finding that the Seventh Circuit's reasoning in *Speicher* suggests that ex-franchisee's continued use of a mark constitutes counterfeiting). The district court in *Century 21* reasoned that an ex-franchisee's continued use of a mark implicates the purposes underlying the

44

counterfeiting provision—avoiding public confusion and safeguarding the value of trademark—because it increases the likelihood that customers will be confused regarding the genuineness of a product. *See id.*

The Court finds the reasoning in *Century 21* persuasive. A reasonable jury could find that that the defendants' continued use of the SPAN mark indicated that the ICE Licensees used the SPAN framework to calculate initial margins, which constitutes counterfeiting because it entails the unauthorized use of CME's mark.

But a reasonable jury would not be *required* to reach that conclusion. Marks may not be identical with or substantially distinguishable from each other, as necessary for counterfeiting, where they have general similarities but also have "minor differences that would not be apparent to the typical consumer." *AstraZeneca AB v. Dr. Reddy's Labs., Inc.*, 209 F. Supp. 3d 744, 755 (D. Del. 2016) (denying motion for judgment on the pleadings regarding whether a pill was a counterfeit because there was a disputed question of fact regarding whether an average consumer would distinguish the defendant's generic two-toned purple pills from the plaintiff's single-tone purple pills); *see also Coach, Inc. v. Citi Trends, Inc.*, No. CV 17-4775-DMG (KSX), 2019 WL 1940622, at *4 (C.D. Cal. Apr. 5, 2019) ("The fact that the designs [of the allegedly counterfeiting goods and the trademark holder's goods] are similar in a general sense, but different in several respects, prevents the Court from determining at [the summary judgment] stage that they are substantially indistinguishable."). And where the use of a mark does not deceive customers about its origin, even a mark that is identical or substantially indistinguishable from a trademark may not be a counterfeit. *See GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 472 (S.D.N.Y. 2011), *aff'd sub*

*nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc.*, 558 F. App'x 116 (2d Cir. 2014) (granting summary judgment for defendants on a counterfeiting claim where there was no evidence that they deceptively suggested their products came from "an erroneous origin").

In this case, at least some of the defendants' allegedly counterfeiting uses of the SPAN mark entailed non-identical marks such as the phrase "SPAN for ICE."  A reasonable jury could find that, due to these differences, the defendants' allegedly counterfeiting uses were not identical to or substantially indistinguishable from the SPAN mark.  And the defendants used the allegedly counterfeiting mark in connection with their own clearinghouses.  Given that context, a reasonable jury could find that traders or other relevant actors in the financial risk services market would not have been deceived about the mark's origin.  Accordingly, there is a genuine factual dispute regarding whether the defendants engaged in counterfeiting.  Therefore, the Court denies CME's motion and the defendants' cross-motion for summary judgment on the counterfeiting claim.

## C.    Breach of contract

Both sides have moved for summary judgment on CME's breach of contract claim, which CME has asserted against only the ICE Licensees.[15]  Under Illinois law, which governs the license agreements, a plaintiff asserting a breach of contract claim must prove four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff.

---

[15] Although ICE has moved for summary judgment on the breach of contract claim, the motion is misplaced because CME did not allege in its complaint that ICE breached a contract.

*Hess v. Bresney*, 784 F.3d 1154, 1158–59 (7th Cir. 2015) (Illinois law).  The parties dispute only the third element.

The parties' arguments regarding breach of contract mirror their arguments with respect to the trademark claims.  CME argues that the ICE Licensees breached the license agreements by using "ICE SPAN" during the term of the agreements and by continuing to use the SPAN mark after their termination.  The ICE Licensees argue that CME has not properly asserted a claim for breach of contract during the term of the agreements and that CME has not established that any post-termination uses constituted a breach.

As indicated, CME's assertion in its summary judgment motion that the ICE Licensees breached the license agreements by using "ICE SPAN" during the term of the agreements amounts to a *de facto* amendment to the complaint.  For the reasons previously stated, the Court declines to permit the amendment, denies CME's motion for summary judgment on the breach of contract claim as it pertains to claimed breaches during the agreements' terms, and declines to address the ICE Licensees' cross-motion for summary judgment on that issue.

The Court also concludes that CME is not entitled to summary judgment on its claim that the ICE Licensees breached the license agreements following their termination.  The ICE Licensees agreed that following termination, they would "not . . . use any mark that is confusingly similar to the SPAN Mark in connection with any other margining system or similar risk calculation."  Pls.' L.R. 56.1 Stmt., Ex. 1, dkt. no. 165-3, ¶ 5(a).  The agreements do not define "confusingly similar."  In its briefs, CME makes a summary argument that the phrase "SPAN for ICE" is confusingly similar to the SPAN

47

mark, but it offers no definition of "confusingly similar" and points to no evidence showing why the phrase "SPAN for ICE" is confusingly similar to the SPAN mark. This is insufficient to "demonstrate the absence of a genuine issue of material fact," as CME must do to prevail on its motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Nor are the ICE Licensees entitled to summary judgment on the breach of contract issue for breaches following the licenses' terminations. In arguing that they did not breach the license agreements post-termination, the ICE Licensees contend that CME has put forth no evidence of actual or likely confusion by market participants. But they have made no effort to show or explain why that is the appropriate standard for breach of the contract. Nor have they pointed to evidence showing why its marks are not confusingly similar to the SPAN mark. Thus the ICE Licensees are not entitled to summary judgment on the breach of contract claim either.

### Conclusion

For the foregoing reasons, the Court grants CME's motion for summary judgment [dkt. no. 165] on counts 2, 3, 5, and 6 against the ICE Licensees on the question of liability, to the extent those claims concern violations that occurred after the termination of the license agreements. The Court also grants summary judgment for CME on the defendants' trademark misuse defense, the ICE Licensees' fair use defense, and the ICE Licensees' defenses of acquiescence for trademark violations occurring after February 23, 2018. The Court denies CME's motion for summary judgment on counts 1 and 4; on counts 2, 3, 5, and 6 to the extent those claims concern violations that occurred during the term of the licenses; and against the ICE Licensees'

defense of acquiescence for violations occurring before February 23, 2018.

The Court denies the defendants' cross-motion for summary judgment [dkt. no. 179] on their counterclaims relating to genericness and abandonment through naked licensing. The Court also denies the defendants' cross-motion on counts 2, 3, 5, and 6 against the ICE Licensees to the extent those claims concern violations that occurred after the termination of the license agreements and on counts 1 and 4. The Court denies the defendants' motion for summary judgment on their trademark misuse defense and their defense of estoppel by implied licenses. The Court disregards the defendants' cross-motion for summary judgment on counts 2 through 6 to the extent those claims concern violations that occurred during the term of the licenses, based on the Court's finding that CME did not plead facts supporting violations during that timeframe.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 12, 2020 (corrected April 17, 2020)

49