**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO MERCANTILE EXCHANGE INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 1376** |
| | ) | |
| **ICE CLEAR US, INC. and ICE CLEAR** | ) | |
| **EUROPE LIMITED,** | ) | |
| | ) | |
| **Defendants;** | ) | |
| | ) | |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

MATTHEW F. KENNELLY, District Judge:

Chicago Mercantile Exchange Inc. (CME) sued ICE Clear US, Inc. and ICE Clear Europe, Limited (collectively, the ICE Licensees), alleging trademark counterfeiting (count 1), trademark infringement (count 2), and unfair competition (count 3), all under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a); breach of contract (count 4); violations of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 (count 5); and unfair competition under Illinois common law (count 6). CME argues that the ICE Licensees unlawfully infringed and counterfeited CME's registered trademark—SPAN, which stands for standard portfolio analysis of risk—in connection with their own services. CME contends that the ICE Licensees' use of CME's mark was governed by their licensing agreements with CME, which they breached. CME also contends that the ICE Licensees unlawfully continued to use the mark after the licensing agreements expired. The ICE Licensees asserted counterclaims for breach of contract against

CME—based on the same licensing agreements—and several affirmative defenses to CME's claims.

Both parties moved for partial summary judgment.  The Court granted summary judgment in favor of CME and against the ICE Licensees as to liability on CME's federal claims for trademark infringement (count 2) and unfair competition (count 3) and its state law claims for deceptive trade practices (count 5) and unfair competition (count 6), covering violations that occurred after CME's termination of the license agreements. The Court also granted summary judgment in CME's favor on the defendants' defenses of trademark misuse, fair use, and acquiescence for trademark violations occurring after February 23, 2018, the date CME filed this suit.

The Court denied CME's motion for summary judgment on its federal trademark counterfeiting claim (count 1) and breach of contract (count 4), and also on counts 2, 3, 5, and 6 with respect to violations that occurred during the licenses' terms.  The Court also denied CME's request for summary judgment on the ICE Licensees' defense of implied license/acquiescence for violations occurring before February 23, 2018.  *See Chicago Mercantile Exch., Inc. v. ICE Clear US, Inc.*, No. 18 C 1376, 2020 WL 1905760 (N.D. Ill. Apr. 17, 2020) (*CME I*).  Finally, the Court denied the defendants' motion for summary judgment on CME's claims and on the defendants' counterclaims relating to genericness and abandonment through naked licensing, their trademark misuse defense, and their defense of estoppel by implied license/acquiescence.  *See id.*

The result of the Court's summary judgment decision was to leave for trial the issues of liability and damages on CME's claims for counterfeiting under the Lanham Act (count 1) and breach of contract (count 4), as well its requests for monetary and

injunctive relief on CME's claims on which the Court made a finding of liability (counts 2, 3, 5, and 6). The Court's decision also left for trial the ICE Licensees' breach of contract counterclaims, as well as a single affirmative defense, specifically the defense of implied license/acquiescence during the period after expiration of ICE's license.

The Court conducted a bench trial from September 11, 2020 until October 1, 2020. This decision constitutes the Court's findings of fact and conclusions of law.

## Facts

At trial, CME contended that the ICE Licensees are liable for trademark counterfeiting (count 1) under the Lanham Act. In connection with this claim, CME seeks the following relief: (1) trebling of the ICE Licensees' profits, and (2) reasonable attorneys' fees, both under 15 U.S.C. § 1117(b). With respect to its trademark infringement claim (count 2), on which the Court made a finding of liability, CME seeks disgorgement of the ICE Licensees' profits and a permanent injunction against their continued use of the SPAN trademark and margining software and services. 15 U.S.C. §§ 1114(1), 1116, 1117(a).

As indicated, the ICE Licensees each asserted a counterclaim against CME for breach of contract, on which they seek damages. The ICE Licensees also asserted an implied license affirmative defense, which they contend covers the period between the expiration of their license agreements with CME (in June and July 2017) and the date CME filed the present lawsuit—February 23, 2018. The ICE Licensees proposed three additional affirmative defenses at trial—extenuating circumstances, nominative fair use, and unclean hands—but these defenses became moot, were improperly reasserted after having been dismissed, or were otherwise inapplicable. For these reasons, the

3

Court does not address these defenses in this ruling.

I.      **CME**

CME is headquartered in Chicago, Illinois.  It operates a clearinghouse and provides financial and risk management services to commodity traders.  Clearinghouses act as intermediaries between buyers and sellers of commodities, thereby reducing the risk that parties will default on a trade and providing stability to markets. Clearinghouses are highly regulated entities—in both the United States and abroad. One way that clearinghouses ensure against default is by setting requirements for initial margins, which are upfront payments that a member of a clearinghouse must make to use its services.

In 1988, CME developed the SPAN framework, which is an initial margining methodology used by financial institutions to assess the risk of portfolios.  As stated earlier, SPAN is an acronym for the phrase standard portfolio analysis of risk, and it is the name under which CME offers margin services and products.  CME owns four trademarks related to the SPAN framework.

SPAN enables clearinghouses to set initial margins by determining how various hypothetical scenarios or market conditions might affect an individual portfolio's profits or losses.  Dhiraj Bawadhankar, CME's executive director of clearing solutions who oversees SPAN licensing, testified at trial that CME uses the SPAN methodology to compute initial margin for futures and options products within CME.  The SPAN methodology includes sixteen different scenarios.  John Pietrowicz, CME's chief financial officer, testified that the SPAN trademark is a valuable CME asset because it is the "gold standard" for margining methodology in the industry.

After CME developed the SPAN framework, it began licensing the SPAN trademark and framework to end customers, service providers, and other clearinghouses.  Suzanne Sprague, a managing director at CME, testified that clearinghouses and exchanges asked to license SPAN in the early 1990's because it saved them time and enabled them to avoid expending funds on developing their own margin methodology to perform portfolio margining for products.  The SPAN license CME offered had a baseline fee of $50,000.  Sprague testified that the SPAN license enables licensees to build the SPAN methodology into their systems themselves rather than using CME's software.

Sprague explained that when CME licenses the use of its SPAN mark to a third party, it makes available the licensees' daily risk array files, which contain data relating to their calculations of initial margins, on its FTP (file sharing) site.  Bawadhankar testified that CME offers the SPAN trademark, the SPAN framework, and a suite of SPAN-related software to other exchanges as part of this licensing scheme and estimated that there are 200 currently active licenses for the SPAN trademark. Bawadhankar further testified that upon execution of a licensing agreement, CME sends the licensee technical information for implementation of the SPAN methodology, which is the product attached to the SPAN trademark.

In June and July 2007, CME entered into SPAN license agreements with the individual ICE Licensees for a term of ten years.  Pursuant to these agreements, CME permitted the ICE Licensees "to use the SPAN Framework . . . and to use the SPAN Mark on and in connection with [their] use of the SPAN Framework and in the marketing and advertising of [their] performance bond system or related risk-based calculations."

Pl.'s Trial Ex. 59 & 60, SPAN License Agreement ¶ 1(a).  Bawadhankar testified that the license agreements include a license for the SPAN trademark, but not the software. The agreements also included a provision requiring licensees to include a disclaimer that stated "SPAN is a registered trademark of Chicago Mercantile Exchange, Inc., used herein under license."  *Id.* ¶ 7(e).  The purpose of this required disclaimer was to make clear to the public that SPAN is owned by CME.  The license agreements also prohibited the ICE Licensees from using any mark that was "confusingly similar" to the SPAN mark during the terms of the agreements.  *Id.* ¶ 7(f).  Upon termination of the license agreements with CME, the ICE Licensees agreed "not to use any mark that is confusingly similar to the SPAN Mark in connection with any other margining system or similar risk calculation."  *Id.* ¶ 5(a).

Internal e-mails from CME regarding the ICE Licensees' implementation of the SPAN framework and another licensee, London Clearing House, reflected that some licensees had made changes to the SPAN algorithm which led to deviations in calculations in their variant SPAN methodologies as compared to CME's SPAN.

## II.    ICE Licensees

The ICE Licensees, which are indirect subsidiaries of ICE, operate clearinghouses and clear trades at ICE-related exchanges.  ICE US is a New York corporation; ICE Clear Europe is a United Kingdom private limited company.  Their customers are clearing members—sophisticated commercial entities—some of which are also customers of CME.  The ICE Licensees offer a suite of services, including trade management, position management, treasury capabilities, physical deliveries, and risk management—the latter of which is at issue in this case, because it involves the

calculation of margins using a margin methodology. Pietrowicz testified that the ICE Licensees and CME are competitors and that risk margining services are important in their industry.

Like CME, the ICE Licensees operate in a highly regulated business environment. Joseph Albert, ICE's senior vice president of clearing architecture, testified that the ICE Licensees are under the scrutiny of various regulators because the highly regulated nature of the commodity clearing businesses. He explained that because clearing businesses are highly regulated, and because they must be highly available for orderly market operation, ICE invests significantly in its software development life cycle.

ICE's chief financial officer Scott Hill testified that clearinghouse customers, commercial entities that need to hedge their exposure to price risk and commercial traders, are not primarily focused on clearing. Rather, they are mainly concerned about managing their exposure to risk, and this business interest is what drives clearing members to trade at ICE. Hill also said that the factors that drive ICE's revenue as a clearinghouse are liquidity, product offerings, costs, and qualities unique to ICE—its risk management team, the team's quality, the quality of the risk model ICE's technology team has built, and the number of products it offers. Hill's testimony generally supported the proposition that the SPAN margining method is not a significant factor in driving the company's revenue.

## III.    The trademark dispute

### A.    Background

In 2008, after the defendants began their ten-year license terms, ICE Clear

Europe designed an initial margining system using publicly available information from London SPAN, a methodology developed independently from the CME SPAN framework. ICE Clear Europe called this "ICE SPAN." In 2009, CME contacted ICE regarding ICE Clear Europe's use of the phrase ICE SPAN in relation to its risk management products and services. In response, ICE Clear Europe eliminated the phrase from its website, software, and other materials, but it resumed using the phrase in 2015. *See, e.g.*, Pl.'s Trial Ex. 77, ICE Clear US Aug. 12, 2015 Notice.

During his testimony on behalf of the ICE Licensees, Paul Phillips, ICE Clear Europe's director of product development, testified that the margin methodology ICE Clear Europe developed was, like London SPAN, a different "flavor" of SPAN that varied from CME SPAN in terms of technical calculation details. Specifically, ICE Clear Europe added new features to ICE SPAN to suit its business needs. For example, ICE Clear Europe's customer base largely consists of European and other non-U.S. customers. Phillips testified that ICE Clear Europe made changes to the SPAN methodology with respect to its calculation method in part to incorporate multiple global currencies. At the time ICE Clear Europe entered into the licensing agreement, CME SPAN would only support calculations involving U.S. dollars, which did not suit ICE Clear Europe's clearing activities.

In 2014, CME conferred internally regarding the ICE Licensees' variant SPAN implementations as well as the variant implementations of SPAN by another licensee, the London Clearing House, which developed London SPAN. CME did not follow up with its licensees at the time regarding the variant SPAN methodologies.

In June and July 2017, CME's license agreements with the ICE Licensees

8

expired.  Nevertheless, the ICE Licensees continued to use the term SPAN in reference

to their risk management systems, including the names SPAN for ICE and ICE SPAN.

*See, e.g.*, Pl.'s Trial Ex. 98, ICE Clear Europe Risk Mgmt. at 2-4, 6-10.

On August 10, 2017, Matthew Kelly, CME managing director and chief I.T.

counsel, e-mailed Johnathan Short, ICE's general counsel, and attached a letter

regarding the license agreements' expiration and the ICE Licensees' continued use of

the SPAN trademark—namely their use of the term in combination with ICE's

trademarks.  Def.'s Trial Ex. 6, Aug. 10, 2017 Kelly E-Mail; Def.'s Trial Ex. 7, Aug. 9,

2017 Kelly Letter.  In the letter, dated August 9, Kelly stated that the ICE Licensees did

not have a license to use the SPAN mark or framework, accused them of misusing the

mark, and pointed out that the use of "ICE SPAN" was improper because "[t]he SPAN®

brand should not be combined with any ICE mark, including 'ICE,' to give the misleading

impression that ICE is the source of SPAN."  Aug. 9, 2017 Kelly Letter at 2.  Kelly told

Short to contact him directly to discuss new licensing arrangements or otherwise "cease

all trademark use."  *Id.* at 1.

On August 16, 2017, Kelly and Short spoke on the phone regarding a new

license agreement.  The parties dispute whether, during this call, Kelly affirmatively

permitted the defendants to continue using the SPAN Mark.  On September 15, 2017,

Short e-mailed a proposed website disclaimer to ICE, which stated "SPAN is a

registered trademark of Chicago Mercantile Exchange Inc., used herein under license."

Def.'s Trial Ex. 12, Sept. 15, 2017 Short E-Mail.  On September 20, 2017, Kelly e-

mailed Short and stated that "[t]hese disclaimers look good."  Def.'s Trial Ex. 14, Sept.

20, 2017 Kelly E-Mail.  CME contends that Kelly approved certain disclaimers the

9

defendants had proposed with the expectation "that a new license agreement would be signed." Pl.'s Proposed Findings of Fact & Conclusions of Law § I.G, ¶¶ 109-10 (dkt. no. 406). The defendants, in contrast, contend that Kelly's approval of the disclaimers resolved any problem with their ongoing use of the SPAN mark, although CME argues that this belief on the part of the defendants was mistaken. *Id.* ¶ 113; Defs.' Proposed Findings of Fact & Conclusions of Law § E.3, ¶¶ 118-123 (dkt. no. 404) Sept. 20, 2017 Kelly E-Mail. Ultimately, CME and the ICE Licensees did not enter into new written license agreements after the expiration of the original agreements.

On February 23, 2018, CME filed the present lawsuit against the ICE Licensees and its parent company, ICE,[1] alleging trademark infringement, trademark counterfeiting, and unfair competition under the Lanham Act and various claims under Illinois law—including breach of contract, deceptive practices, and unfair competition. Following the filing of the lawsuit, the ICE Licensees initiated a rebranding exercise, based on the belief that a new licensing relationship was unlikely.

On June 14, 2018, ICE Clear Europe disseminated a circular to its customers communicating the rebranding of SPAN for ICE to "ICE® Risk Model," abbreviated as IRM, which involved eliminating any mention of SPAN from the ICE website. Pl.'s Trial Ex. 110, June 14, 2018 ICE Clear Europe Circular. SPAN for ICE, which later became IRM, was only capable of calculating initial margining for ICE clearing and could not be used for CME products or any other clearinghouse. Phillips expanded on this point when he testified that SPAN for ICE was developed specifically for the benefit of ICE Licensees' customers and that it had no utility beyond ICE.

---

[1] The claims against ICE, the parent entity, were later dismissed.

On July 13, 2018, ICE stopped all use of the SPAN trademark and completed its rebrand of its software and services to "ICE Risk Model" or "IRM."  Phillips testified that he participated in the rebranding exercise, namely removing the name SPAN and replacing it with ICE Risk Model as the new name for the initial margin calculator.

The parties dispute whether the ICE Licensees continued to use the SPAN mark to identify their margin models after CME filed its lawsuit.  CME contends that the defendants were doing so as of April 18, 2018, two months after CME filed its lawsuit, through July 13, 2018.  *See* Pl.'s Proposed Findings of Fact & Conclusions of Law § I.G, ¶¶ 129-132.  CME also contends that the defendants used the mark on their websites between July 13, 2018 and November 26, 2019 by allowing "downloads of historical SPAN specification documents" and that "ICE Europe continued to offer downloads of SPAN for ICE software."  *Id.* ¶ 149.

CME argued at trial that the period of July 13, 2018 through November 26, 2019 was a "residual use period" during which the ICE Licensees continued to use the SPAN mark.  Specifically, CME says, the SPAN mark was available on historic circulars and downloadable software designated as SPAN on the defendants' websites.  Luis Moreau, a trademark paralegal at Norvell IP, testified that on November 13, 2019, August 31, 2020, and September 1, 2020, he conducted research on the use of the term "SPAN" or "SPAN for ICE" in connection with ICE and ICE's website by using the Google search engine.  Moreau testified that the purpose of this search was to identify if there was any use of the SPAN trademark by ICE.  He retrieved five documents, but they were not actively linked on the website.  *See* Pl.'s Trial Ex. 190, 191, 192, 195, 212, Moreau SPAN for ICE Captures.  Rather they were outdated files, which the ICE Licensees

promptly deleted once the files were called to their attention. At trial, Sprague testified that ICE breached the parties' agreement by using the term "SPAN," "ICE SPAN," and "SPAN for ICE" in connection with other margining systems after the license agreements expired. Steven Ishmael, CME's director of clearing solutions, testified that CME did not consent to the ICE Licensees' continued use of the SPAN mark after the agreements' expiration.

CME contends that it was harmed as a result of the defendants' infringement of the SPAN mark—namely that it lost control of the mark and the defendants' misuse likely confused or misled customers into believing there was a connection, sponsorship, endorsement or affiliation between CME and ICE, which did not exist. Ishmael further suggested during his testimony that the ICE Licensees' continued use of the SPAN mark could cause harm to CME's ability to maintain its licensing program. Pietrowicz testified similarly and indicated that the ICE Licensees' holdover use of the SPAN trademark could cause CME to lose control of the trademark which, in turn, could impact its ability to control the quality of the underlying SPAN methodology and cause industry risk with regard to reliability, trustworthiness, and industry standards for margining systems.

In contrast, Michael Gibson, ICE's former Chief Operating Officer, testified during his deposition that the SPAN for ICE mark was distinctive and that the underlying margin methodology that ICE developed differed significantly from CME SPAN in features and technical calculation details. Benjamin Jackson, ICE's president, testified that ICE's highly sophisticated customer base, which overlaps considerably with CME's, could understand the differences between the parties' distinct products, software, and

services and was therefore unlikely to experience confusion.

      **B.**        **Disgorgement of profits for trademark infringement**

As indicated, the Court entered summary judgment in CME's favor with respect to liability on its trademark infringement claim. Specifically, the Court ruled that the ICE Licensees infringed CME's SPAN trademark through their continued use of the SPAN mark after their license agreements with CME expired.

On the trademark infringement claim, CME seeks disgorgement of the defendants' profits during two relevant periods based on an analysis by its damages expert, Kimberly Schenk. Schenk's Damages Period #1 extends from the expiration of the license agreements in June and July 2017 through the IRM rebrand on July 13, 2018. CME contends that during this damages period, the defendants earned $1,389,052,093 in clearinghouse revenue. Schenk's Damages Period #2 covers the ICE Licensees' "residual use" period from July 14, 2018 through November 26, 2019; CME contends that the defendants earned $1,971,935,138 in revenue for this period. Schenk testified that, after deducting allowable expenses and variable costs, with respect to the first damages period, CME is entitled to disgorge either $1,376,291,971 in profits, or if the Court accepts certain deductions proposed by the defendants' damages expert, $701,333,609 in profits. Regarding the second, "residual use period," CME contends that after subtracting variable expenses, it is entitled to disgorge $1,938,479,714.

A significant aspect of the parties' dispute regarding disgorgement of profits involves what portion of the defendants' profits is attributable to their infringement of CME's SPAN mark, as opposed to other factors. This involves, in part, the degree to

13

which having a reliable initial margin methodology, like SPAN, is an important function of a clearinghouse *and* attracts customers. CME contends that the ability to calculate margins is the most important function of a clearinghouse. This is supported by the testimony of Bawadhankar, who testified that margining is a very important component of a clearinghouse's operations. Conversely, ICE's CFO Hill testified that it is an important function, though not the most important. Either way, CME's contention misses the point. This case is about the infringement of CME's SPAN trademark, not infringement of its margining methodology, as CME asserted no claim in that regard. The Court will return to this topic later in this decision.

In any event, ICE's Hill testified, persuasively in the Court's view, that having the SPAN brand and methodology is not what drove customers' decisions to work with the ICE Licensees.

As should be apparent by this point, the parties' respective experts have a significant dispute over the amount of the defendants' profits that CME is entitled to recover. As explained below, Schenk and Green essentially agree on what constitutes at-issue revenue with respect to the damages period covering the expiration of the licenses through the date of the ICE Licensees' rebranding. They disagree, however, regarding deductions for amounts attributable to the ICE Licensees' non-infringing activities.

During her testimony at trial, Schenk explained the analytical process that informed her opinion on the ICE Licensees profits associated with their misuse of the SPAN trademark. Schenk testified that she first evaluated the amount of revenue and profits earned by the ICE Licensees during the periods when they infringed the SPAN

trademark.  Schenk concluded that the ICE Licensees earned a total of $1,389,052,093 during her first damages period, based on her review of the defendants' financial statements.  She referred to this figure as at-issue revenue during Damages Period #1. It includes (1) clearing fees that the defendants earned from the clearing of products that are margined using the SPAN methodology, which totaled $1,332,809,833, and (2) member interest and fee conduit revenue, which totaled $56,242,259.

To briefly explain, clearing fees are fees charged to the clearing member for trades that are executed and cleared by the ICE Licensees; these fees cover the services that are performed by the exchange.  In her calculation, Schenk excluded clearing fees that were earned from the clearing of products that were not margined using the SPAN methodology.  Member interest and fee conduit revenue—as best as the Court could make it out—is interest and fees that the clearinghouses earn on the margined deposits that they hold on behalf of the clearing members.

Schenk further testified that after she deducted from the "at-issue revenue" figure $12,760,122 in variable costs, including license fees for ICE Clear Europe, bonuses, non-cash compensation, and marketing, the net profits the ICE Licensees earned during Damages Period #1 amounted to $1,376,291,971.

Schenk also rendered an opinion regarding the profits the ICE Licensees earned during Damages Period #2, the claimed "residual use" period–from July 14, 2018 through November 26, 2019.  Specifically, Schenk testified that that the ICE Licensees' net profits during this period amounted to $1,938,479,714 in profits based on the use of the SPAN mark during the residual use period.  The at-issue revenue she calculated for the residual use period was $1,971,935,138.  Schenk deducted variable costs totaling

15

$33,455,424 from that figure.

The ICE Licensees' damages expert Green testified that based on CME's past licensing history, CME is entitled to no more than $100,000, which is the highest amount that any licensee has paid CME to use the SPAN trademark. Green also opined that Schenk's profits calculation improperly attributed all of the ICE Licensees' profits to use of the SPAN trademark. Green's starting point was essentially the same as Schenk's. Specifically, Green testified that the accused revenue during Damages Period #1 totals $1,389,052,092, which differs from Schenk's figure by only one dollar. Green reached this figure by adding the ICE Licensees' clearing revenue and member interest and fee conduit revenue, which totaled $299,761,392 for ICE US and $1,089,290,700 for ICE Clear Europe. This is identical to the calculation Schenk performed.

Further, Green testified that to determine profits attributable to infringement of the SPAN marks, the accused revenue figure of $1,389,052,092 should be reduced by deducting: (1) $170,923,820 in clearing profits earned from non-SPAN products; (2) $509,544,438 in profits attributable to non-U.S. trades that did not impact U.S. commerce; (3) a $675,280,393 "market share" adjustment; and after subtracting $7,767,364 in operating expenses. The Court will explain Green's deductions in more detail later in this decision. These deductions and subtraction of operating expenses bring the remaining profits potentially attributable to infringement of the SPAN marks to a figure of $25,536,077. Green—after performing an apportionment analysis— contended that the actual amount of profits attributable to infringement is zero.

16

C.        **Trademark counterfeiting**

Turning to CME's trademark counterfeiting claim, CME argues that the ICE Licensees' use of the trademark "SPAN" in connection with their own risk margining services and software, post-license expiration, constitutes counterfeiting.  In connection to this claim, CME seeks an award of three times the defendants' profits, plus attorneys' fees.

The ICE Licensees dispute the contention that they engaged in counterfeiting of CME's SPAN mark.  Phillips testified that customers knew that the ICE Licensees' "ICE SPAN" or "SPAN for ICE" software would only calculate initial margin for clearing by ICE.  Likewise, Albert testified that ICE SPAN was ICE's own technology that it was providing in support of its own business.  Thus ICE's technology could not be used to calculate initial margins in connection with any other clearinghouse.  More generally, the ICE Licensees contend that the terms "ICE SPAN," "SPAN for ICE," and later IRM designations distinguished their software from CME's SPAN product such that there was no counterfeiting.

D.        **Breach of contract claim; affirmative defense; counterclaims**

1.        **CME's breach of contract claim**

In support of its breach of contract claim, CME contends that the ICE Licensees breached their license agreements by using a mark that is confusingly similar to the SPAN mark in connection to their margining software and services after the licenses expired.  The ICE Licensees argue, in response, that CME did not suffer any actual injury based on their post-expiration use of the SPAN mark and thus CME's breach of contract claim lacks merit.

17

### 2. ICE Licensees' contentions

Turning to the ICE Licensees' arguments, they contended at trial that they had implied licenses during the period prior to February 23, 2018, the filing of the present lawsuit, that operates as a defense to all of CME's claims against them: trademark infringement, trademark counterfeiting, and breach of contract. The ICE Licensees also assert counterclaims for breach of contract against CME.

### a. Implied license/acquiescence

The Court previously determined that the ICE Licensees did not have an implied license to use the SPAN marks after February 23, 2018, the date that CME filed the present lawsuit. Importantly, the Court found in CME's favor on the issue of liability on its trademark infringement claim with respect to the ICE Licensees' post-license expiration use of the SPAN mark. This was, however, subject to the defendants' implied license/acquiescence defense, on which the Court denied both sides' summary judgment motions for the period between license expiration (June 26, 2017 and July 7, 2017), and the date CME filed the present lawsuit, February 23, 2018. Thus on the question of liability, this defense was still a live issue for trial.

As indicated, the ICE Licensees assert an implied license defense regarding their use of the SPAN mark between the expiration of the license agreements—on June 26, 2017 (ICE US) and July 7, 2017 (ICE Clear Europe)—and February 23, 2018. The defendants rely on Short's trial testimony and certain correspondence, which they contend establishes that CME (1) continued to operate on the terms of the license by holding ICE out as a licensee and (2) was in the process of getting new license terms to ICE. This, the ICE Licensees contend, is affirmative evidence that CME's conduct

amounted to active representation permitting the defendants to use the SPAN mark.

Specifically, Short testified that he had several phone calls with Kelly, including a conversation on September 13, 2017, in which Kelly told Short to draft new disclaimers and told Short that he would get new SPAN license terms to him. As mentioned, CME approved the ICE Licensees' proposed website disclaimers one week later, on September 20, 2017, as shown by e-mail correspondence between Short and Kelly. *See* Sept. 20, 2017 Kelly E-Mail.

Short testified that he was shocked when—five months after Kelly approved ICE's website disclaimers—CME filed the present lawsuit. The ICE Licensees argue that because Kelly did not testify at trial, the Court did not hear anything from CME to contradict Short's testimony and thus the Court should find in favor of the ICE Licensees on their implied license affirmative defense.

In response, CME as that the implied license defense lacks merit because CME delivered the ICE Licensees a cease and desist letter on August 10, 2017, stating they were no longer licensees, and never represented to the ICE Licensees that it would not assert trademark rights or that they could continue to use the SPAN mark.

### b. Breach of contract counterclaim

Next, the ICE Licensees contend that CME breached its contract with the them because it failed to control the nature and quality of goods and services offered under the SPAN mark, as required under the license agreements. Relying on Bawadhankar's cross-examination, in which he testified that CME does not have a means by which it can track entities and individuals using SPAN, the defendants contend that CME failed to police third party use of the SPAN mark, such as its use by other licensees and

sublicensees. This, the ICE Licensees argued, reflects that CME does not value SPAN particularly highly and further, that it constitutes a failure on CME's part to fulfill its obligations under the license agreements. CME argued, in response, that it did not breach the license agreements because it sufficiently controlled the SPAN mark, particularly the ICE Licensees' use of the SPAN mark, and that the ICE Licensees did not suffer any injury as a result of CME's claimed breach.

**Discussion**

I. **Lanham Act claims**

In counts 1 and 2 of CME's amended complaint, it alleges that the ICE Licensees violated 15 U.S.C. § 1114(1) by counterfeiting and infringing CME's registered marks.

As defined by the Lanham Act, a trademark is "any word, name, symbol, or device, or any combination thereof used by a person … to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127.

A. **Infringement**

As indicated, the Court granted summary judgment on liability in favor of CME regarding the ICE Licensees' continued use of the SPAN marks after the license agreements expired on June 26, 2017 (ICE Clear Europe) and July 6, 2017 (ICE US). In particular, the Court concluded that the ICE Licensees' use of the phrase "SPAN for ICE" or "ICE SPAN" was likely to confuse participants in the financial risk services markets. *CME I*, 2020 WL 1905760, at *19. As indicated earlier, the grant of summary judgment was subject to the defendants' implied license defense for the period between license expiration and CME's filing of this lawsuit, which the Court concluded was an

20

issue for trial.  Thus the remaining issues on CME's trademark infringement claim are the defendants' implied license defense and the appropriate remedies for CME, matters the Court will address below.

### 1.    "Residual use" period

At trial, CME contended that ICE's use of SPAN after it rebranded on July 13, 2018—the "residual use period" extending through November 26, 2019—constituted trademark infringement.  Schenk incorporated the claimed infringement during this period into her calculations.  Schenk was asked what she understood the infringing uses to be during this residual use period.  She identified two uses:  the availability of historical circulars on the ICE website, and some downloadable software still being called SPAN.

ICE argues that these references to SPAN were just historical posts on its website, involving material that had been communicated to customers before July 13, 2018.  CME disagrees, arguing that these were not simple historical uses of a trademark but actual 2019 uses of the SPAN trademark.  Accordingly, CME asks this Court to conclude that ICE's infringement continued until November 26, 2019.

"[The Lanham Act] is concerned with the use of trademarks in connection with the sale of goods or services in a manner likely to lead to consumer confusion as to the source of such goods or services."  *1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 409 (2d Cir. 2005).  "Residual use, such as token use, use by sale of the remaining inventory containing the mark, or use merely to prevent others from using the mark, are not bona fide uses under the Lanham Act."  *MB Fin. Bank, N.A. v. MB Real Estate Servs., L.L.C.*, No. 02 C 5925, 2003 WL 21462501, at *9 (N.D. Ill. June 23, 2003), *report*

*and recommendation adopted*, No. 02 C 5925, 2003 WL 22765022 (N.D. Ill. Nov. 21, 2003).

CME failed to establish that these residual uses constituted trademark infringement. As discussed earlier, the Court previously concluded that the ICE Licensees committed trademark infringement when they continued to use the term SPAN in reference to their risk management systems "after the termination of the license agreements" in June and July 2017. *CME I*, 2020 WL 1905760, at *2, 18-19. The Court's ruling, however, did not address the issue of the ICE Licensees' residual references to SPAN on their websites. Rather, the conduct before the Court at that point involved ICE's continued affirmative use of the SPAN mark in connection with risk management services. The current issue, by contrast, involves ICE's continued use (on materials available on its website) of the term SPAN *after* it rebranded its software and services to call them "ICE Risk Model" or "IRM." This is not the same affirmative use of the SPAN mark that the Court found constituted trademark infringement.

The Court finds that the ICE Licensees' residual references to SPAN—in historic circulars and software links with legacy SPAN calculator files—during the period from the rebranding on July 13, 2018 through November 26, 2019 did not constitute bona fide use in commerce and that CME failed to establish by a preponderance of the evidence that these historical posts constituted use the SPAN mark in a manner that was likely to confuse customers. *See* 15 U.S.C. § 1127; *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) ("Allowing a mark owner to preserve trademark rights by posting the mark on a functional yet almost purposeless website, at such a nominal expense, is the type of token and residual use of a mark that the Lanham Act does not

consider a bona fide use in commerce."), *aff'd*, 747 F.3d 929 (7th Cir. 2014); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 760-61 (N.D. Ill. 2018) (Kennelly, J.) (concluding that a Japanese company's use of a U.S. company's trademark in marketing materials on its website did not affect commerce in the United States); *Metropolitan Life Ins. Co. v. O'M & Assocs. LLC*, No. 06 C 5812, 2009 WL 3015210, at *3 (N.D. Ill. Sept. 16, 2009) ("Residual use, such as token use . . . are not bona fide uses under the Lanham Act.") (internal quotation marks omitted).

In sum, CME cannot recover for trademark infringement based on the defendants' residual references to SPAN.

### 2. Implied license defense

The ICE Licensees contend that CME permitted them to use the SPAN mark after the termination of the license agreements, and therefore they used the SPAN mark pursuant to an implied license up until February 23, 2018, the date CME filed the lawsuit. "[I]n some circumstances, 'the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license.'" *All Star Championship Racing, Inc. v. O'Reilly Auto. Servs.*, 940 F. Supp. 2d 850, 863 (C.D. Ill. 2013) (quoting *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995). The Supreme Court has held that "[a]ny language used by the owner . . . or any conduct on his part exhibited to another, from which that other may properly infer that the owner consents to his use" of the trademark, "constitutes a license, and a defense to an action for a tort." *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *see also Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000) ("It is irrelevant whether the parties thought of the arrangement at

23

the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties.").

"The Seventh Circuit applies the same three-part test to determine whether a trademark owner impliedly consented to or acquiesced in another party's use of its mark." *CME I*, 2020 WL 1905760, at *5 (citing *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 941 (7th Cir. 2016)). The ICE Licensees' burden at trial was to show that "(1) CME 'actively represented that it would not assert a right or claim'"; "(2) CME's 'delay between the active representation and assertion of the right or claim was not excusable'"; and "(3) 'the delay caused the defendants undue prejudice.'" *CME I*, 2020 WL 1905760, at *5 (quoting *Hyson USA*, 821 F.3d at 941) (alteration accepted). As this Court noted on summary judgment, "[t]he parties dispute only the active representation element." *CME I*, 2020 WL 1905760, at *5.

"A trademark owner can convey an active representation through its 'words or conduct.'" *Id.* at *5 (quoting *Hyson USA*, 821 F.3d at 941). The ICE Licensees contend that the testimony of Johnathan Short, ICE's general counsel, regarding his phone and e-mail correspondence with CME's managing director and chief I.T. counsel, Matthew Kelly, in September 2017, establishes that CME actively represented that it would not assert a right or claim against them for continued use of the SPAN mark. The defendants contended at trial that three distinct actions on the part of Kelly, all of which occurred in September 2017—(1) Kelly's direction to Short to develop new disclaimers, (2) approval of ICE's website disclaimers, and (3) communication that he would get new license terms to ICE—establish their right to use the SPAN mark after the license expired, up until the date CME sued them.

24

In response, CME contends that the defendants failed to prove CME made any active representation, because (1) ICE knew that the licenses had expired, per the August 2017 cease and desist letter; (2) there was evidence that certain ICE representatives, like Gibson, knew that the licenses were expiring or had expired; and (3) there was no documentary evidence of CME's supposed active representations—only Short's testimony regarding his phone conversations with Kelly. Further, CME contends that Short's testimony did not establish that CME expressly told him that ICE could continue to use the SPAN trademark.

There is no question that the August 9, 2017 cease and desist letter made it clear that because the term of the license agreements had run, "neither ICE US nor ICE Europe has a license to use the SPAN® trademark or the SPAN framework." *See* Aug. 9, 2017 Kelly Letter. The defense involves, however, events that took place after issuance of the letter.

As indicated, on September 15, 2017, Short e-mailed Kelly two proposed SPAN disclaimers that ICE would put on its website. Sept. 15, 2017 Short E-Mail. The first disclaimer Short proposed included the following language: "SPAN® is a registered trademark of Chicago Mercantile Exchange Inc., *used herein under license*." *Id.* (emphasis added). When Short did not receive an e-mail response from Kelly, he followed up via e-mail on September 20. That same day, Kelly responded with a one sentence e-mail: "These disclaimers look good." Sept. 20, 2017 Kelly E-Mail.

As of that date, it was readily apparent to CME that ICE was continuing to act as it had before expiration of the licenses. Among other things, the licenses required the ICE Licensees to provide CME "risk array files," and they continued to do that after

25

Kelly's letter told them the licenses had expired. CME's receipt of these materials plainly put it on notice—even if nothing else did—that the ICE Licensees were continuing to act as they had before.

The ICE Licensees did not, of course, have new license agreements in place. That's why the defense is referred to as an *implied* license. But it was clear from Short's testimony, which was uncontradicted and persuasive, that he was advised that the only holdup on that was the need for CME to make an internal decision about what its licensing regime would look like going forward. The ICE Licensees, via Short, believed that they were acting and could continue to act as they had before receipt of Kelly's letter. And once Kelly e-mailed Short that CME had approved the ICE Licensees' proposed disclaimers, they had an affirmative representation (an "active" representation, to put it another way) that they could continue to use the term SPAN, at least with the newly-approved disclaimers—which they promptly put into effect.

In short, the Court finds that, as of the September 20, 2017, the date of CME's approval of the revised disclaimers, the ICE Licensees had an implied license to continue to use the SPAN mark, as they had prior to the written licenses' expiration.[2] The implied license did not come into effect before September 20, 2017, however. As

---

[2] Although the second and third elements of the implied license defense are not disputed, the Court notes that the defendants have satisfied them. As indicated, CME "allowed" the ICE Licensees "to continue using the marks for months," from September 20, 2017 until February 23, 2018. *Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534, 540 (7th Cir. 2017). "That delay is inexcusable, satisfying the second part of the three-part test." *Id.* As for the third element, undue prejudice, the ICE Licensees have shown this, given that they not only used the SPAN mark but represented via the disclaimers that they were doing so with permission. After approving the disclaimers, CME's "failure to promptly assert [its] rights prejudiced" the ICE Licensees. *Id.*

indicated, an *active* representation allowing use of the mark is required, and the ICE Licensees had none until then.  Before that, all they had was the cease-and-desist letter that they had received on August 10.  It may be true that CME took no affirmative steps *beyond* issuance of the letter to prevent usage at that point, but CME was not required to immediately file a lawsuit or to, figuratively, repeatedly pound on the ICE Licensees' door and tell them to stop once it had issued the letter.  If non-action for a brief period after issuance of a cease-and-desist letter were enough to give rise to an implied license, than *every* holdover licensee (and, for that matter, every infringer) would have an implied license until a lawsuit was filed.  This would encourage immediate filing of lawsuits contemporaneously with the issuance of a cease-and-desist letter, which would not be a positive development given the general policy in favor of promoting voluntary resolution of legal disputes.

But once CME approved the ICE Licensees' proposed new disclaimers at a point when it knew (or reasonably ought to have known) that they were still using the SPAN mark, it "actively" represented that this continued usage, with the disclaimers, was permissible.  This is so even though, it appears, Kelly told Short that revised written license agreements would be forthcoming once CME had determined what revisions would be needed.  "At that point, it would have been perfectly reasonable for [CME] to require [the defendants] to cease using the [SPAN] mark[] until the disputes were resolved."  *Wine & Canvas Dev.*, 868 F.3d at 540.  But CME did not do so; instead it approved ICE's proposed disclaimers, including language that ICE's use of the SPAN mark *was being* "*used . . . under license*."  Sept. 20, 2017 Kelly E-Mail (emphasis added).

The implied license ended, however, on the date CME filed the present lawsuit against the defendants, February 23, 2018. The Court has already so ruled on summary judgment, and nothing about the existence of an implied license before that date is contrary to the Court's prior ruling. An implied license can be terminated unilaterally by the trademark holder, by words or actions that show it is no longer willing to permit the use of its mark. The Restatement (Third) of Unfair Competition, in relevant part, explains this in its discussion of the "implied consent" defense's applicability in trademark infringement actions (this is effectively the same concept as an implied license):

> Consent precludes the imposition of liability for acts occurring while the consent is effective. If the consent is terminated, an actor has no defense with respect to any use of the trademark subsequent to the termination. Consent is terminated when the actor knows or has reason to know that the trademark owner is no longer willing to permit the particular use. The unwillingness may be manifested by words or by conduct inconsistent with continued consent, *such as the commencement of an infringement action*.

Restatement (Third) of Unfair Competition § 29 (1995) (emphasis added); *see Hyson USA*, 921 F.3d at 940 (citing section 29).

Courts are in agreement that a trademark license is terminable at will by the trademark owner, even where it is an express license (unless the license is for a particular term) and certainly when the license is only implied. *See Coach House Rest., Inc. v. Coach and Six Rest., Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991) (concluding that an "implied license is terminable at will" and thus the mark owner may "terminate the license at any time and sue registrant for trademark infringement and unfair competition for any use subsequent to termination"); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 847 F. Supp. 18, 20 n.1 (E.D.N.Y. 1994) ("An agreement conferring a

28

license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable-at-will by the licensor."); *Birthright v. Birthright Inc.*, 827 F. Supp. 1114, 1135 (D.N.J. 1993).  *See also Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 922 (C.D. Ill. 2000) ("A license containing no time frame is generally terminable at will.") (citing *Dial-A-Mattress*, 847 F. Supp. at 19).  When it filed the present lawsuit on February 23, 2018, CME terminated the implied license that it had conferred on September 20, 2017.

In sum, the ICE Licensees met their burden to prove proving that they had an implied license to use the SPAN trademark from September 20, 2017 (but not earlier) until February 23, 2018 (but not later).[3]  The Court will discuss the effect of this finding on CME's entitlement to relief later in this decision.

### 3. Willfulness

CME asks the Court to find that the defendants willfully infringed the SPAN mark. CME argued at trial that the defendants knowingly infringed the mark after the licenses expired in June and July 2017, ignored the August 2017 cease and desist letter, and continued to infringe even after CME filed the present lawsuit on February 23, 2018.

"Willful infringement may be attributed to the defendant's actions where he had knowledge that his conduct constituted infringement or where he showed a reckless disregard for the owner's rights."  *Luxottica Grp. S.p.A. v. Li Chen*, No. 16 C 6850, 2017 WL 836228, at *2 (N.D. Ill. Mar. 2, 2017) (quoting *Bulgari, S.P.A. v. Zou Xiaohong*, No.

---

[3] The Court finds unpersuasive CME's "inevitable confusion" argument offered to rebut the implied license defense.  Given the disclaimer used by the ICE Licensees during the period the Court has found they had an implied license, there was no inevitable confusion.

15 C 05148, 2015 WL 6083202, at *2 (N.D. Ill. Oct. 15, 2015)). Knowledge "can be inferred from a defendant's conduct, including, for instance, that the defendant ignored the plaintiff's notices, did not seek advice of an attorney, and passed the matter off as a nuisance." *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1039 (E.D. Wis. 2018) (internal quotation marks omitted and alterations accepted).

The Court finds CME has failed to establish this, with the exception of the relatively modest period following the filing of this lawsuit until the date of the rebrand. As the ICE Licensees contend, ICE's communication (via Short, an attorney) with CME reflects that the defendants were acting in good faith when they continued to use the SPAN mark; at least, CME failed to prove otherwise. The ICE Licensees did not ignore CME's notice; rather they sought further guidance; there was an indication that a revised license agreement would be forthcoming; they developed disclaimers and were told they sufficed; and they applied those disclaimers while awaiting further communication from CME. And for a significant part of the period in question, as the Court has ruled, the ICE Licensees were not simply holdover licensees; they had an implied license. CME met its burden of establishing willful infringement only for the period following the filing of the present lawsuit.

### B. Counterfeiting

The Court turns next to CME's counterfeiting claim. The Lanham Act prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale . . . of any goods or services [where] such use is likely to cause confusion . . . or to deceive." 15 U.S.C. § 1114(1)(a). The Act defines a counterfeit mark as "a spurious mark which is identical with, or substantially

30

indistinguishable from, a registered mark." *Id.* § 1127; 5 McCarthy on Trademarks and Unfair Competition §§ 25:10, 15.50 (5th ed. 2020).

Importantly, "the use of a counterfeit mark in the context of the Lanham Act is not, in and of itself, a cause of action." *All Star*, 940 F. Supp. 2d at 866. "Rather, in a civil action arising under § 1114, a finding that a counterfeit mark was used permits certain additional remedies" such as: treble damages under section 1117(b), statutory damages under section 1117(c), and attorneys' fees pursuant to section 1117(a). *Id.*

"Counterfeiting is the act of producing or selling a product with a sham trademark that is an intentional and calculated reproduction of the genuine trademark." *Specht v. Google*, 660 F. Supp. 2d 858, 865 (N.D. Ill. 2009); *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007) (defendant's conduct constituted counterfeiting because "the logos and labeling on [defendant]'s counterfeit software closely resembled Microsoft's marks, so [defendant]'s products were likely to confuse consumers."); *see* McCarthy, *supra*, § 25:10 ("Often, counterfeit merchandise is made so as to imitate a well-known product … so as to deceive customers into thinking that they are getting genuine merchandise. Thus, counterfeiting is "hard core" or "first degree" trademark infringement and is the most blatant and egregious form of "passing off."). "Thus, counterfeiting is a subset of trademark infringement." *Specht*, 660 F. Supp. at 865-66 (internal quotation marks omitted and alterations accepted).

The Seventh Circuit has explained that "[w]hen attempting to determine if two marks are similar, the comparison should be made in light of what happens in the marketplace, not merely by looking at the two marks side-by-side." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001). Further, the court has stated that the

"aim" of section 1114(1)(a) is to "prohibit the use of your trademark on someone else's product without your authorization." *Gen. Elec. Co. v. Speicher*, 877 F.2d 531, 534 (7th Cir. 1989).

CME's burden at trial, therefore, was to prove by a preponderance of the evidence that ICE Licensees used a trademark that was (1) spurious—identical with or substantially indistinguishable from SPAN; (2) on the goods or services for which the genuine mark is registered; (3) without CME's authorization. *All Star*, 940 F. Supp. 2d at 866.

CME argues that it established that the ICE Licensees engaged in counterfeiting by using, after expiration of the license agreements, a mark identical or substantially indistinguishable from CME's registered and incontestable SPAN trademark for risk margining services identical to those covered by CME's trademark. Specifically, CME contends that the ICE Licensees continued to use the SPAN mark by making SPAN-branded documents and/or SPAN-branded software available for download on its website. CME contends that this usage of the SPAN mark was without CME's consent. It contends that the ICE Licensees' use of the SPAN mark deceived customers about both origin and affiliation with CME. CME asks the Court to award it three times the defendants' profits from the alleged counterfeiting, as well as reasonable attorney's fees, based on what it characterizes as an intentional violation.[4] 15 U.S.C. § 1117(b).

The ICE Licensees contend that CME did not prove they used a spurious mark in connection with offering or selling risk margining services after the license agreements expired. They also contend that they used phrases that identified ICE as the source of

---

[4] CME has elected to forego statutory damages for counterfeiting.

its software and risk margining services to its customers—"ICE SPAN," or "SPAN for ICE"—as well as appropriate disclaimers that CME approved. The ICE Licensees also argue that their conduct did not constitute counterfeiting because they identified themselves as the originators of the initial margining services they offered and did not use marks that were identical or substantially indistinguishable from the SPAN mark, and there is no evidence that "SPAN for ICE" deceived customers about the origins of the mark or the products upon which the ICE Licensees used it.

The Court concludes that CME failed to meet its burden on this claim. Initially, CME seems to suggest, via its proposed findings of fact and conclusions of law, that the defendants' mere possession of CME's mark and the Court's finding of trademark infringement liability supports a finding that the defendants engaged in counterfeiting. *See* Pl.'s Proposed Findings of Fact & Conclusions of Law § I.D, ¶ 59, § II.A, ¶¶ 232-50. That is not so. "The happenstance of having trademarks made by the owner in one's possession, so that one doesn't have to copy them, has no relevance to the purpose of the [counterfeiting] statute." *Speicher*, 877 F.2d at 535. Accordingly, the defendants' simple possession of CME's mark and the Court's finding of trademark infringement do not support a finding that the defendants engaged in counterfeiting.

### 1. Spuriousness

The Court further concludes that CME failed to establish that the mark as used by defendants was spurious—i.e., identical or substantially indistinguishable from the SPAN mark. "Marks may not be identical with or substantially distinguishable from each other, as necessary for counterfeiting, where they have general similarities but also have 'minor differences that would not be apparent to the typical consumer.'" *CME I*,

33

2020 WL 1905760, at *20 (quoting *AstraZeneca AB v. Dr. Reddy's Labs., Inc.*, 209 F. Supp. 3d 744, 755 (D. Del. 2016)); *see also Coach, Inc. v. Citi Trends, Inc.*, No. CV 17-4775-DMG (KSX), 2019 WL 1940622, at *4 (C.D. Cal. Apr. 5, 2019) ("The fact that the designs [of the allegedly counterfeiting goods and the trademark holder's goods] are similar in a general sense, but different in several respects, prevents the Court from determining at [the summary judgment] stage that they are substantially indistinguishable.").

In its ruling on summary judgment, the Court suggested that "at least some of the defendants' allegedly counterfeiting uses of the SPAN mark entailed non-identical marks such as the phrase 'SPAN for ICE.'" *CME I*, 2020 WL 1905760, at *21. For this reason, the Court said, "a reasonable [factfinder] could find that, due to these differences, the defendants' allegedly counterfeiting uses were not identical to or substantially indistinguishable from the SPAN mark." *Id.*

The ICE Licensees' explanation that the designation "SPAN for ICE" made their marks sufficiently distinguishable from CME SPAN is persuasive. For example, the designation "SPAN for ICE" sufficiently communicated that ICE's product could only calculate initial margin for ICE clearing, and not in connection to any other clearinghouse. *See H-D U.S.A.*, 311 F. Supp. 3d at 1027 ('[The more pertinent question [in a counterfeiting inquiry] is whether the marks, not the goods, are substantially identical"); Restatement (Third) of Unfair Competition § 36 (1995) ("[t]he difference between counterfeiting and traditional trademark infringement . . . is one of degree, depending chiefly on intent and the similarity of the infringing mark to the genuine mark"); *see* McCarthy, *supra*, § 25:15:20 ("The test of 'identical with, or substantially

34

indistinguishable from' [for purposes of a counterfeiting claim] requires a closer degree of similarity than is required for traditional trademark infringement or unfair competition").

Finally, the ICE Licensees established that CME okayed the designation "SPAN for ICE" based on e-mail correspondence between Kelly, CME's chief I.T. counsel, and Short, ICE's general counsel. The e-mail exchange reflects that CME approved disclaimers that ICE proposed to put on its websites, including the ICE Licensees' websites. *See* Sept. 20, 2017 Kelly E-Mail. These disclaimers made it sufficiently clear to the public that the mark used by the ICE Licensees was connected to their customized version of the SPAN methodology, not CME SPAN.

### 2.      SPAN references in ICE Licensees' services

The defendants established at trial that ICE SPAN was a methodology with features and variations of their own design. The Court found persuasive the defendants' contention that SPAN for ICE was developed for ICE customers and has no utility beyond ICE. This cuts against the contention that the defendants' supposedly spurious mark was used for services *identical* to those covered by SPAN. The goods and services upon which the ICE Licensees used their mark were ICE-specific, not services covered by CME's trademark.

### 3.      Possible deception vis-à-vis customers

"[W]here the use of a mark does not deceive customers about its origin, even a mark that is identical or substantially indistinguishable from a trademark may not be a counterfeit." *CME I*, 2020 WL 1905760, at *20 (citing *GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 472 (S.D.N.Y. 2011), *aff'd sub nom. GMA Accessories, Inc.*

*v. Elec. Wonderland, Inc.*, 558 F. App'x 116 (2d Cir. 2014) (granting summary judgment for defendants on a counterfeiting claim where there was no evidence that they deceptively suggested their products came from "an erroneous origin")). That is the case here. As explained in the previous sections, the ICE Licensees used the SPAN for ICE and ICE SPAN designations in connection with the business of their own clearinghouses, and included an "ICE" signifier.

In sum, CME did not meet its burden of proving by a preponderance of the evidence that, in the marketplace, ICE used an "actual counterfeit" of SPAN. *See Aris Isotoner Inc. v. Dong Jin Trading Co., Inc.*, No. 87 C 890, 1989 WL 236526, at 4* n.5, (S.D.N.Y. Sept. 22, 1989) (an infringer sold gloves bearing a design similar to the plaintiff's trademarked design that the Court concluded was not counterfeit); *see also Sun Products Grp., Inc. v. B & E Sales Co.*, 700 F. Supp. 366, 386, n.21 (E.D. Mich. 1988) (holding that competitor's sale of a foldable headrest with name and trade dress that were merely similar to that of trademark holder was not sufficient to constitute use of a counterfeit mark or warrant treble damages)).

### 4. Holdover licensees

At trial, the parties also disputed whether the ICE Licensees' use of the SPAN mark as holdover licensees is itself sufficient to constitute counterfeiting. In its ruling on summary judgment, the Court concluded that a reasonable factfinder could "find that the defendants' continued use of the SPAN mark indicated that the ICE Licensees used the SPAN framework to calculate initial margins, which constitutes counterfeiting because it entails the unauthorized use of CME's mark" but that "a reasonable [factfinder] would not be *required* to reach that conclusion." *CME I*, 2020 WL 1905760, at *20.

At trial, CME characterized the defendants' conduct as a textbook case of counterfeiting because ICE is a holdover licensee. In contrast, the ICE Licensees argued that the Court should see ICE's holdover use in context. In support of their argument that their holdover use of the mark did not constitute counterfeiting, the ICE Licensees point out that they included the ICE clearinghouse name in the branding of their margining services and also noted that CME is not the source of ICE's margin calculator.

The question of counterfeiting liability of a holdover licensee has not been addressed by the Seventh Circuit, and many courts—including the Sixth Circuit and the Ninth Circuit—disagree on whether the presumption of counterfeiting should apply to such cases. *See CME I*, 2020 WL 1905760, at *44. The Court is generally persuaded by other courts' conclusions that holdover use of a mark typically constitutes counterfeiting. *See Century 21 Real Estate, LLC v. Destiny Real Estate Props.*, No. 411 C 38, 2011 WL 6736060, at *5 (N.D. Ind. Dec. 19, 2011) (ex-franchisee's continued use of a mark constitutes counterfeiting); *Elder Care Providers of Ind., Inc. v. Home Instead, Inc.*, No. 14 C 1894, 2017 WL 1106093, at *17 (S.D. Ind. Mar. 24, 2017) (finding *Century 21* persuasive and concluding that "the unlicensed use by a hold-over franchisee constitutes the use of counterfeit marks"); *All Star*, 940 F. Supp. 2d 850 at 866-67 ("holdover licensee's use of a formerly-licensed mark [does] constitute[] the use of a counterfeit mark) (internal quotations omitted).

In this case, however, the ICE Licensees used a mark that was distinguishable in name from CME's mark, as an identifier for a methodology that was a variant of CME's margin calculation tool—in other words, it was not the same margin calculator. The ICE

37

Licensees' variant of SPAN had substantially different technical details from CME's SPAN mark. The Court in *Century 21* held that an ex-franchisee's continued use of a mark implicates the purposes underlying the counterfeiting provision—including safeguarding the value of the trademark and avoid consumer confusion regarding a product's genuineness. *See Century 21*, 2011 WL 6736060, at *4. But the ICE Licensees did not use the SPAN mark in connection with inauthentic products or services. Thus their conduct does not "powerfully invoke both the doctrine and policy underlying trademark-counterfeiting prohibitions." Travis R. Wimberly, Note, *Holdover Trademark Licensees and the Counterfeiting Loophole*, 88 Tex. L. Rev. 415, 417 (2009).

In sum, CME failed to meet its burden of establishing that the ICE Licensees engaged in counterfeiting prohibited by the Lanham Act. The Court therefore need not address the ICE Licensees' implied license defense in connection to CME's trademark counterfeiting claim.

## II. Breach of contract claims and counterclaims

In count 4, CME asserts a breach of contract claim against each of the ICE Licensees. CME argues that they improperly used the term SPAN for ICE, which CME contends is confusingly similar to CME's SPAN trademark, in connection with their risk margining system after the license agreements expired.

The ICE Licensees agreed that following termination of the license agreement, they would "not . . . use any mark that is confusingly similar to the SPAN Mark in connection with any other margining system or similar risk calculation." SPAN License Agreement ¶ 5(a). The ICE Licensees contend that CME failed to prove that they

breached the agreements. They argue that the phrase "confusingly similar"—which is not defined in the license agreement—did not cover the use of the term SPAN if it was preceded or followed immediately by a company name or acronym. Further, they contend that CME did put into evidence that anyone, such as customers, were confused by the ICE Licensees' use of the terms "SPAN for ICE" or "ICE SPAN."

The ICE Licensees have also asserted a breach of contract counterclaim against CME, contending that CME violated the licensing agreement. Specifically, the ICE Licensees contend that CME "did not control consistency in the quality and nature of the goods and services identified under the SPAN mark" because it "repeated[ly] fail[ed] to monitor existing licenses" or "control the continued use of the SPAN Mark after expiration of such licenses." Defs.' Proposed Findings of Fact & Conclusions of Law ¶¶ § F, 49, 50. They contend that they are entitled to damages for CME's breach.

The license agreements are governed by Illinois law. Illinois law requires a party asserting a breach of contract claim to prove four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff. *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (applying Illinois law).

Section 5(a) of the license agreements, which prohibits the licensee from using any mark confusingly similar to SPAN, states that:

> Upon any termination pursuant to Section 4 of this Agreement, Licensee shall immediately cease using the SPAN framework and shall immediately cease using the SPAN Mark in its advertising or marketing or in any other manner. Any use of the Span Framework, the SPAN mark or any other licensed properties thereafter will constitute infringement and a violation of Licensor's rights. *Upon termination of this Agreement, Licensee further covenants and agrees not to use any mark that is confusingly similar to the SPAN Mark in connection with any other margining system or similar*

*risk calculation*.

SPAN License Agreement ¶ 5(a) (emphasis added). Section 5(b) states that the

provisions of Section 5 "shall survive any termination of this Agreement." *Id.* ¶ 5(b).

Section 4(a)-(b) lays out three circumstances under which the licensor or licensee may

terminate the license agreement. *See id.* ¶ 4(a)-(b).

### A.    CME's claim

Illinois law follows the "four corners" rule in interpreting contracts: if a written

agreement is unambiguous, then the scope of the parties' obligations must be

determined from the contract language without reference to extrinsic evidence. *See*

*SMS Demag Aktiengesellschaft v. Material Sciences Corp.*, 565 F.3d 365, 372 (7th Cir.

2009).

Assuming for purposes of discussion that CME proved that the ICE Licensees

breached the licensing agreements through post-termination use of the SPAN

trademark, CME failed to prove that it suffered any damages caused by the breach.

CME argues that it suffered harm to its reputation and loss of control over the

trademark. ICE argues that CME's alleged harm was theoretical and that no CME

witness identified any actual harm.

The testimony of CME's primary witness regarding alleged injury from the

defendants' breach of contract, Suzanne Sprague, failed to establish that the ICE

Licensees' holdover use of the SPAN mark, or any mark that was allegedly confusingly

similar, caused CME any actual harm. Sprague credibly testified only to *potential*

negative impact and *possible* harm. And no other testimony or evidence offered by

CME filled this gap in its proof. "Merely showing that a contract has been breached

without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract." *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007). "In Illinois, in order to recover for breach of contract, a plaintiff must establish both "that he sustained damages" and a "reasonable basis for computation of those damages." *See id.* (internal citations omitted). CME did neither.

Moreover, as the ICE Licensees established at trial, internal e-mails from CME reveal that it did not regard the SPAN mark as highly valuable in and of itself, which supposed the proposition that any harm, reputational or otherwise, was negligible or non-existent. *See, e.g.*, Def.'s Trial Ex. 177, CME Internal E-Mail ("[t]he reality is that we license SPAN for peanuts to our primary competitor"). Finally, as recently as May 7, 2020, CME has held ICE out as a "registered exchange" using "SPAN," which also cuts against CME's claim of reputational harm, given *its own* continued association of SPAN with the ICE licensees. Defs.' Proposed Findings of Fact & Conclusions of Law § F, ¶ 162; Defs.' Trial Ex. 435, CME SPAN Methodology Overview.

For these reasons, the Court finds in favor of defendants on CME's breach of contract claim.

### B. ICE Licensees' counterclaim

The license agreement provides that "Licensor shall control the nature and quality of all goods and services identified by the SPAN Mark." SPAN License Agreement ¶ 1(c). This presumably derives from the requirement, under the Lanham Act, that a trademark licensor must exercise supervision of its licensees to ensure that the licensor's mark is not used to deceive the public regarding the quality of goods or services bearing the name of the mark. *See Oberlin v. Marlin Am. Corp.*, 596 F.2d

1322, 1327 (7th Cir. 1979) ("The Lanham Act requires supervision of trademark licensees at the expense of abandonment of the trademark.").

The ICE Licensees contend that CME breached the agreements because it failed to control the SPAN mark, as required by paragraph 1(c). *See* SPAN License Agreement ¶ 1(c). This contention is unavailing, for several reasons.

First, the ICE Licensees did not establish that CME failed to exercise its contractual rights and assert reasonable control. The ICE Licensees argued that CME failed to monitor existing licensees, including Calypso Technologies, a company that CME gave an unbounded right to sublicense SPAN to other entities. The defendants contend that CME failed to monitor either Calypso or various sublicensees' use of SPAN. But this by itself is not evidence that CME failed to "maintain the quality and uniformity of the trademarked product" or otherwise evidence of a violation of ¶ 1(c). *Draeger Oil Co., Inc. v. Uno-Ven Co.*, 314 F.3d 299, 300 (7th Cir. 2002). Furthermore, the evidence at trial showed that CME monitored the use of the SPAN mark and enforced its rights to the SPAN trademark with respect to the licensees in the present lawsuit. *See, e.g.*, Defs.' Trial Ex. 290, 2009 E-Mails Regarding ICE SPAN Term (ICE's general counsel, Short, agreeing to implement website revisions and refrain from calling its margining software "ICE SPAN").

Second, ICE produced no evidence to support its contention that CME's failure to control SPAN when it licensed the mark to any other licensee led to a deviation in the quality of licensed products. CME's position on this point is supported by the testimony of Steven Ishmael, who oversees SPAN design, implementation, and adoption, including helping firms manage any new changes with SPAN and working with

licensees to enhance CME's service and support any requested changes. His testimony, which the Court found credible, undercuts the defendants' contention that CME failed to fulfill its contractual obligations by failing to control the use of SPAN.

Third, CME justifiably relied on the expertise of its licensees—all sophisticated financial institutions like ICE—to deliver services that maintain the SPAN framework's quality. Moreover, licensees like ICE themselves deal with sophisticated consumers, which also supports the appropriateness of CME's reliance on licensees to maintain SPAN's quality.

Even if this Court were to find that CME breached the licensing agreements, the ICE Licensees have offered no evidence, or even an argument, that they experienced any damage resulting from CME's alleged breach. In particular, the ICE Licensees offered no evidence that CME's purported failure to police licensees harmed them in any way with respect to their use of SPAN or otherwise. Without evidence of damage, they cannot prevail on their breach of contract counterclaim. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 149, 835 N.E.2d 801, 832 (2005) ("the basic theory of damages for breach of contract [is] . . . the claimant must establish an actual loss or measurable damages resulting from the breach in order to recover").

For these reasons, the Court finds in favor of CME on the defendants' breach of contract counterclaim.

III.   **Relief**

CME seeks disgorgement of the ICE Licensees' profits based on their infringement of CME's trademark, as of the termination of the license agreements, that is, June 26, 2017 (ICE US agreement expiration) and July 7, 2017 (ICE Clear Europe

43

agreement expiration) through July 13, 2018 (the date of rebranding). CME also seeks injunctive relief pursuant to section 1116 against the ICE Licensees for their infringement of CME's trademark. (Because the Court has concluded that CME failed to establish its counterfeiting claim, it need not address CME's requests for relief related to that claim).

### A. Disgorgement of profits

As indicated, by the time of trial, the Court had already found the ICE Licensees liable for infringing CME's trademark, subject to the implied license defense, which the Court has now adjudicated. At trial, CME introduced evidence—namely through its damages expert, Schenk—regarding its entitlement to recover any profits the ICE Licensees earned from trademark infringement under the Lanham Act, 15 U.S.C. § 1117(a). The ICE Licensees argue that the Court should deny CME's request to recover profits on the ground that CME failed to prove by a preponderance of the evidence that they earned any profits from infringement. The ICE Licensees cite, among other things, the testimony of Green, their damages expert, that CME is not entitled to any profits, and they contend that at most, CME is entitled to recover $100,000, the amount of fees they paid for the use of the SPAN trademark.

Disgorgement of profits in a Lanham Act case is an equitable remedy. *See Ariel Investments LLC v. Ariel Capital Advisors, LLC*, No. 15 C 3717, 2017 WL 1049464, at *2 (N.D. Ill. Mar. 20, 2017); *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1092-96 (7th Cir. 1994) (noting that the "Lanham Act allows the district court a wide range of legal and equitable remedies for a violation of the Act" including disgorgement of profits).

44

To recover the ICE Licensees' profits under the Lanham Act, CME's only burden was to prove the ICE Licensees' sales. Then the burden shifted to the ICE Licensees to "prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). The burden on the defendants includes any contention that some or all of their total profits were not attributable to their use of CME's mark. *See* McCarthy, *supra*, § 30:65; *WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. 2008) (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-07 (1942)).

As a general matter, the remedy of disgorgement of profits is not intended to give the trademark owner an excessive and therefore improper windfall. *Speicher*, 877 F.2d at 535 ("an automatic award of profits in a trademark infringement case could confer a windfall on the plaintiff"); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992) (reversing damages award that was "a windfall to the plaintiff" because "the award of profits [bore] no relationship to [infringer's] enrichment"); *BASF Corp.*, 41 F.3d at 1096 (cautioning against "'overcompensat[ing] for a plaintiff's actual injury and creat[ing] a windfall judgment at the [defendant's] expense'") (quoting *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992)). On the other hand, the Supreme Court has made it clear that even though "[t]here may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark," *Mishawaka Rubber*, 316 U.S. at 206-07, this does not preclude an aggrieved trademark owner from recovering the infringer's profits, because doing so "would give the windfall to the wrongdoer." *Id.* at 207.

The ICE Licensees contend that any award of profits should be apportioned to exclude profits resulting from use of their margining software (i.e., the SPAN for ICE

45

margining calculator) so that the award includes only profits that are attributable to the use of the SPAN trademark itself.  *See* Defs.' Trial Br. at 1 (dkt. no. 389).  CME disagrees; it contends that the Supreme Court has held that it is improper to separate a trademark from the underlying goods and services in an attempt to apportion the defendants' profits.  Pl.'s Trial Br. at 1 (dkt. no. 387) (citing *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251 (1916)).  CME contends that the Court in *Hamilton-Brown Shoe* held that "it is practically impossible to isolate an infringing trademark from the goods and services with which that mark is being used."  Pl.'s Trial Br. at 1.

### 1.    Permissibility of apportionment of profits

The Court concludes that in assessing profits in a trademark infringement case, it is permissible and appropriate to disaggregate the trademark from the product to which it is attached.  CME's argument does not accurately describe the holding of *Hamilton-Brown Shoe*.  The Supreme Court stated in that case that "[i]f one wrongfully mixes his own goods with those of another, *so that they cannot be distinguished and separated*, he shall lose the whole, for the reason that the fault is his."  *Id*. (emphasis added). *Hamilton-Brown Shoe*, 240 U.S. at 262.  The Court did not hold that it is impossible to apportion profits in cases involving trademark infringement.  Rather, it described particular circumstances under which apportionment is impossible—where an infringer "wrongfully mixes his own goods with those of another."  *Id.*

The Court built upon the *Hamilton-Brown Shoe* decision in *Mishawaka Rubber*, when it held that "[t]he burden is the infringer's to prove that his infringement had no cash value in sales made by him."  *Mishawaka Rubber*, 316 U.S. at 206-07.  *Mishawaka Rubber* thus shows that the Supreme Court did, in fact, envision scenarios in which

46

apportionment is possible: in particular, where an infringer meets its burden to show that it did not profit (or profited less than contended) from its infringing conduct. *Id.* Still later, in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946), the Supreme Court clarified the scenario in which apportionment is *not* appropriate:

> And in cases where a wrongdoer [1] has incorporated the subject of a plaintiff's patent or trade-mark [2] in a single product to which the defendant has contributed other elements of value or utility, and [3] has derived profits from the sale of the product, this Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits.

*Id.* at 265. Following these decisions, the Seventh Circuit weighed in on the subject in *WMS Gaming*, in which it cited *Hamilton-Brown* and *Mishawaka Rubber* to support the proposition that the defendant has the "burden to show which portions of its gross income [are] not attributable to its infringing uses [of the plaintiff's mark]." *WMS Gaming Inc.*, 542 F.3d at 608.

These cases make clear that an infringer is not barred from apportioning profits that are attributable to its use of the owner's mark from those attributable to other factors, or that there is anything like a generally-applicable principle of "inherent impossibility of making an approximate apportionment," as CME contends. Pl.'s Trial Br. at 3; *see WMS Gaming Inc.*, 542 F.3d at 608-09 (explaining that it is the defendant's "burden to show which portions of its gross income were not attributable to its infringing uses"). To the contrary, apportionment is not just possible, but appropriate, in cases in which non-infringing and infringing elements of a defendant's earnings can "be readily separated." *See WMS Gaming Inc.*, 542 F.3d at 608 (citing *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994)).

The Court also overrules CME's contention that willful or deliberate infringement is a bar to apportionment. The apportionment exercise is distinct from and not dependent upon a finding of willfulness, and *WMS Gaming Inc.* does not hold or suggest (nor does any other binding or persuasive decision) that willful infringement prevents the infringer from making deductions and proposing apportionments. *See WMS Gaming Inc.*, 542 F.3d at 608-09; McCarthy, *supra*, § 30:62 (explaining the degree to which willfulness is relevant, but not dispositive, in accounting for defendant's profits in an infringement action). The inquiry regarding the defendants' willfulness therefore has no bearing on the permissibility of an apportionment exercise.

In sum, the law is clear: apportionment of an infringer's profits is acceptable and appropriate when some or all of the infringer's profits are shown to be attributable to factors other than infringement. *See* McCarthy, *supra*, § 30:65; *Dyson, Inc. v. SharkNinja Operating LLC*, No. 14 C 9442, 2019 WL 1454509, at *8 (N.D. Ill. Mar. 31, 2019) ("[defendant] had the burden to prove . . . any basis for apportioning profits to exclude those 'not obtained through' its Lanham Act violation") (internal quotation marks and citations omitted); *see also Wm. Wrigley, Jr., Co. v. L.P. Larson, Jr. Co.*, 5 F.2d 731, 749 (N.D. Ill. 1925) ("The defendant is therefore liable to account for such profits *only as have accrued to itself from its wrongful acts*, and *not for those which have accrued to another*. . .") (citing *Hamilton-Brown Shoe*) (emphasis added).

### 2. ICE Licensees' proposed deductions and apportionment

The Court turns next to the defendants' proposed apportionment of their claimed profits. The apportionment of profits between lawful and unlawful activity "is highly fact-specific and should be left to the [factfinder]." *Dyson*, 2019 WL 1454509, at *13. When

the proper apportionment "cannot be ascertained with any reasonable certainty," the "resulting windfall risk should be borne by the defendant, not the plaintiff." *Id.* at \*14 (citing *WMS Gaming*, 542 F.3d at 607-08).

Under the framework the Seventh Circuit laid out in *WMS Gaming*, CME proved the ICE Licensees' gross sales during the relevant period, and the burden then shifted to the defendants to prove deductions. *WMS Gaming*, 542 F.3d at 606-08. In this case, the defendants' damages expert, Phil Green, and CME's damages expert, Kimberly Schenk, agree that the ICE Licensees earned approximately $1.389 billion in revenue between the license expiration and IRM rebrand. But the experts' analyses differ significantly with respect to (1) the deduction of expenses and (2) the apportionment of profits to factors other than the SPAN trademark.

Phillip Green, the defendants' damages expert, testified that in his view, there are no identifiable revenues or profits attributable to the defendants' allegedly infringing use of the SPAN trademark. He concluded that CME should recover nothing, or at most, no more than the $100,000 the ICE Licensees paid for licenses. Green's analysis included three key steps: (1) identifying potentially relevant revenue, which included making certain adjustments to the overall amount; (2) subtracting costs from the adjusted revenue figure; and (3) performing further apportionment analysis.

At step one, Green took Schenk's at-issue revenue figure, which was about $1.389 billion, and made three key deductions: (1) about $170.9 million from non-"SPAN" products; (2) about $509.5 million in non-U.S. revenue, i.e., non-U.S. trades that did not impact U.S. commerce; and (3) a so-called market share adjustment of about $675.2 million.

49

With respect to the first deduction, Green testified that ICE Clear Europe earned $170.9 million from clearing services that do not involve the use of the SPAN methodology, namely energy products, which are not cleared using SPAN. Next, with respect to the second deduction, Green deducted non-U.S. revenue in the amount of $509.5 million because the Lanham Act permits the trademark owner to recover only for infringement that occurred in the United States. The ICE Licensees earned this revenue through clearing services involving non-U.S. traders and non-U.S. clearing members. Green testified, for example, that if ICE Clear Europe had a trader placing a trade in Germany, which would be cleared through a clearing member located in Europe, then ICE Clear Europe would clear that trade; thus, it would not be subject to U.S. trademark law. Green testified that he reached the $509.5 million figure based on a financial analysis of non-U.S. trading revenues that ICE prepared and provided to him. Green explained that ICE collects this information—regarding the revenue it earns in various jurisdictions—for tax purposes.

Regarding his third deduction, Green testified concerning the analytical process of determining what he referred to as a market share adjustment. On this point, Green first considered whether there was any difference in the ICE Licensees' operations when they rebranded from SPAN to IRM on July 13, 2018, to assist in understanding the connection between the rebrand and any gain or loss of customers (i.e., the change in their market share). In particular, he compared the trading volumes of the defendants' margining services to the trading volumes of CME's margining services for the eighteen months before the ICE rebrand and the eighteen months after the rebrand. Green stated that before the rebrand, ICE had a market share of about 27.6 percent,

but after the rebrand, it decreased to 26.3 percent. This was a 4.7 percent decline in the market share ICE had prior to rebrand, which translated into about $19 million in revenue for ICE Clear Europe and $14 million in revenue for ICE US, a total of about $33 million. Green concluded that the $33 million figure was the highest amount of the defendants' revenue that could possibly be associated with their use of the SPAN trademark. Green thus contended that the adjusted revenues potentially attributable to actionable infringement amounted to about $33.3 million.

Green then subtracted from the $33 million adjusted revenue figure a total of $7.8 million in operating expenses. He reviewed regulatory filings and internal documents to determine what the ICE Licensees' operating expenses were during the period from license expiration to rebrand. For both the ICE Licensees, Green concluded, it was about 23.3 percent. The $7.8 million in operating expenses that Green subtracted represents about 23.3 percent of the $33.3 million in adjusted revenues that Green had concluded was the highest amount of revenues potentially attributable to infringement of SPAN.

Green also testified that he performed a linear regression analysis because he understood from ICE's CFO, Scott Hill, that certain operating costs may be fixed over short terms, but variable over long terms. Green therefore compared the changes in the defendants' revenues to the changes in their total operating expenses. This led him to conclude that about 16 cents of every additional dollar of revenue would be a variable expense. Thus Green concluded that variable expenses amounted to about 16 percent of the defendants' revenue.

Green concluded that the recoverable net profits potentially attributable to SPAN

from the date of license expiration until the rebranding date of July 13, 2018—a figure he described as "maximum corrected profits"—amounted to $25.5 million. Green alternatively proposed adjusting the damages period to begin on February 23, 2018, rather than the license expiration date, and end on July 13, 2018. This, effectively, assumed the validity of the defendants' implied license defense up until the date CME filed this lawsuit. This adjustment would reduce the ICE Licensees' maximum corrected profits figure—from the date the lawsuit was filed until the rebranding—to $10.1 million.

Finally, Green conducted an apportionment analysis. He made nine key points at this stage: (1) the SPAN trademark does not drive customer choice of trading platform, as indicated by ICE CFO Hill's trial testimony; (2) CME has not promoted SPAN through marketing; (3) SPAN for ICE and CME's PC-SPAN software products were free, as established by Moreau and Sprague's trial testimony; (4) SPAN relates only to calculation of initial margin, and it is not used for intra-day trades; (5) there has been no identifiable change in the ICE Licensees' trading volume, revenues, or expenses post-rebrand to IRM; (6) there were no costs associated with the IRM rebrand; (7) CME's own conduct indicates that SPAN has no value; (8) public perception of SPAN, CME's "overhaul" of SPAN, and CME's implementation of a new value-at-risk model indicates SPAN's lack of value; and (9) CME's SPAN licensing activities—such as its execution of over one hundred framework agreements, none of which exceed $100,000—indicate a relative lack of value.

Based on his apportionment analysis, Green concluded that the $25.5 million in potentially recoverable profits should be reduced to $0. Green's rationale was twofold: (1) there were no identifiable ICE revenues or profits attributable to the SPAN

52

trademark; and (2) CME had a history of providing SPAN framework license renewals for free. If any amount was owed to CME, Green concluded that based on CME's licensing history of SPAN trademarks, the figure should be no more than $100,000—the amount in licensing fees the ICE Licensees paid CME to use SPAN.

CME presented a countervailing analysis through its damages expert Kimberly Schenk. Schenk agreed with Green's deduction for non-SPAN products. She disagreed, however, regarding Green's proposed market share adjustment and his apportionment of profits to factors other than infringement of CME's SPAN trademark. To summarize, first, Schenk testified that she accepted the defendants' deduction for non-U.S. and non-SPAN product revenues, which reflected a total of $680 million in deductions, resulting in an at-issue revenue figure of $708,583,835. She also deducted what she concluded were the defendants' variable costs and found that their profits for the period from license expiration through July 13, 2018, the date of the ICE rebrand, amounted to $701,333,609.

Schenk disagreed, however, with Green's decisions to make a market share adjustment and subtract operating expenses. Schenk testified that Green failed to adjust his market share analysis to take into account other events that could have impacted the parties' market shares in the eighteen-month period before rebrand and the eighteen-month period post-rebrand. Specifically, she contended that his analysis relied on the premise that macroeconomic events impact all market participants equally and that any macroeconomic events that did occur during that time period affected the parties—and other market share participants—equally. This, Schenk contended, was faulty logic. She explained, for example, the parties' market share could have been

affected by factors such as their degree of investment in interest rates. Thus, Schenk testified that Green's analysis was far from the clean before-and-after market share analysis that he presented it to be. During closing arguments, CME repeated its contention that Green's analysis failed to account or control for variables that could have impacted the parties' market share before and after rebrand.

Schenk also criticized Green's operating expense deduction. Her testimony on this point was somewhat less than crystal clear. One critique (though not the only one) appears to be that Green's conclusion that variable expenses were about 16 percent of revenue contradicted ICE CFO Hill's representation that variable expenses are only 4 percent of operating expenses. CME emphasized during closing argument that Hill testified that ICE's expenses are fixed on a month-to-month basis. For this and other reasons, CME contends that Green's operating expenses deduction is not reliable.

Schenk also disagreed with several of Green's points associated with his apportionment analysis. First, regarding Green's point one, Schenk testified that Green did not show a lack of connection between the SPAN trademark and ICE's at-issue revenue because he focused on traders, rather than clearing members. Further, Schenk identified what she considered to be clear evidence that the SPAN trademark is very valuable to the ICE Licensees. This included: (1) their licensing of SPAN for ten years and telling everyone they were using SPAN; (2) their continued use of SPAN after the licenses expired; and (3) ICE Clear Europe's revenue growth from $0 to $1 billion during the licensing period. Schenk also opined, with respect to Green's point six, that the defendants' rebrand expenses are irrelevant in apportioning profits. Regarding Green's point five, the "before and after" rebrand review of trading volumes and ICE's

revenues/expenses, Schenk stated that this did not establish a lack of connection between the defendants' infringement of the SPAN mark and profits. She pointed to June 14, 2018 ICE Clear Europe circular in which it stated to customers that it was in the process of rebranding but was not changing the "current technical implementation of the margin model." Schenk indicated that by stating this, ICE Clear Europe essentially communicated to its customers—prior to rebrand—that it would continue to use SPAN (i.e., the margining software). Turning to points seven and nine, Schenk testified that neither CME's revenue/profits nor its licensing practices reflect a lack of connection between the licensees' trademark infringement and profits.

More generally, Schenk also testified that in her view, based on the evidence, there is significant goodwill in the SPAN brand that "derives from the widespread use and adoption and the trust that it's earned over the last 30 years." Trial Tr. 480-81. Schenk believed the evidence supported the view that the decision to join the ICE Licenses' clearinghouse was driven, to a significant extent, by the use of the SPAN brand. Though Schenk also associated this initial decision-making with the ability to use the SPAN *methodology*—over which CME has asserted not trademark or other intellectual property rights in this case—this does not diminish the force of her testimony that the association with CME and sense of reliability derived from the use of the SPAN mark is likely a significant factor taken into account in deciding whether to become members of an ICE Licensee's clearinghouse.

The Court is not persuaded by Schenk's decision not to make an adjustment for market share and not to deduct operating expenses and, conversely, is persuaded by Green's decision to do so. First, Green's market share adjustment was appropriate.

The defendants' respective market shares for the eighteen months prior to rebranding and the eighteen months following rebrand—roughly 2017 to 2019—decreased by only 1.3 percent. This is a persuasive indication that only that amount of revenue—about $33 million altogether—can reasonably be attributed to the ICE Licensees' previous use of the SPAN mark. The Court notes that Schenk, though she disagreed with the concept of a market share adjustment, did not offer an alternative calculation regarding such an adjustment if, as the Court has found, one should be made.

Next, Schenk's argument that Green's operating expenses analysis was unreliable was not persuasive, and, conversely, Green's analysis on this point was. As shown by the ICE Licensees' income statements, about 23.3 percent of their revenue went to operating expenses. It is therefore appropriate to apply this percentage to the adjusted revenue figure to determine the defendants' operating expenses to be deducted from their adjusted revenues. The Court again notes that Schenk did not provide an alternative calculation for operating expenses or otherwise persuasively refute the ICE Licensees' evidence of their operating expenses between license expiration and rebrand. In short, the ICE Licensees proved their operating expenses, which include compensation, general administrative expenses, and intercompany expenses and totals 23.3 percent of revenue, are appropriately deducted in calculating their profits. *See* McCarthy, *supra*, § 30:66.

In sum, the ICE Licensees' evidence regarding appropriately-considered revenues and deductible expenses was sufficient to carry their burden of persuasion and refute CME's contention that it should be awarded as profits the entire amount of the ICE Licenses' gross sales up until the date of the IRM rebrand, July 13, 2018. As

56

the Court has indicated, CME does not dispute that the ICE Licensees' first two deductions—for non-U.S. trades and non-SPAN products—were appropriate. Further, as the Court has found, Green's market share adjustment was an appropriate deduction. Likewise, the ICE Licensees' deduction of operating expenses in the amount of 23.3 percent of revenue was appropriate, as the Court has found. In sum, the ICE Licensees met their burden of proving that these are appropriate reductions to their revenues claimed to result from infringement. The Court therefore finds that the highest amount of *net* profits that CME is entitled to recover for the period from license expiration through the July 13, 2018 rebrand date, before consideration of apportionment and the implied license defense is $25.5 million.

Next is the question of apportionment. Beyond deduction of appropriate expenses, a plaintiff is not entitled to disgorgement of profits that the defendant establishes were not earned by infringing the plaintiff's marks. *WMS Gaming*, 542 F.3d at 601. This involves "distinguish[ing] between profits attributable to [their infringing activity] and profits attributable to legitimate business activities." *Dyson*, 2019 WL 1454509, at *13. As indicated, Green contended that the figure should be reduced to zero, based on the proposition that traders and companies do not base their purchase of the ICE Licensees' services on the Licensees' use of the SPAN mark. Green also appeared to place heavy emphasis on the fact that CME has never charged a license fee of more than $100,000; he contended that this tended to show that the mark had a very low value in the overall scheme of things.

The defendants bear the burden of establishing apportionment of their profits to factors other than use of the plaintiff's mark. *See WMS Gaming*, 542 F.3d at 608-09.

The Court found Green's testimony that the mark was effectively worthless—or, at most, worth no more than the license fee—wholly unpersuasive. More broadly, the Court also found unpersuasive the defendants' contention that their use of the SPAN marked effectively played no role in their earning of revenues and, as a result, profits. By contrast, the Court found persuasive CME expert Schenk's testimony and other evidence that use of the SPAN name does, in fact, play a reasonably significant role in causing customers to conduct business with a particular clearinghouse—in this case, the ICE Licensees. The evidence that the SPAN mark is an indicator of quality and reliability based upon, among other things, its association with CME, was credible and persuasive, and it undercuts Green's and the defendants' contention that the branding was, effectively, meaningless. This is supported by, among other things, the defendants' extended use of the SPAN mark, including in their marketing; their continued use of the mark (and desire to continue using it) even after their license expired; and their attempts to reassure customers about their rebranding all are indicative of a significant value derived from use of the SPAN mark.

The Court also found unpersuasive the contention that the mark was worth no more than the license fee, or perhaps even less. If that were the case, there would have been no reason or incentive for the ICE Licensees to purchase and use the license to begin with. A reasonable inference may be drawn that they found the association with CME that came from use of the marks to be worth significantly more than the modest fee they were paying.

In sum, the Court finds that the defendants failed to prove by a preponderance of the evidence their contention that none of their profits were attributable to their

infringement of the plaintiff's mark. And the defendants offered no other basis, aside from Green's unsupportable reference to the license fee, to make any sort of apportionment below the $25.5 million figure.[5] Because the defendants failed to sustain their burden, the Court finds that the profits that the ICE Licensees earned from their use of the mark from the date of the license expiration forward was $25.5 million.

It is conceivable that the Court's use of the $25.5 million profit figure amounts to a windfall to CME, at least to some extent. That, however, is not dispositive. "There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." *Mishawaka Rubber*, 316 U.S. at 207. In addition, the evidence provided a reasonable basis to find that association with CME is likely a reasonably significant factor in driving customers to a clearinghouse that uses margining methodology branded with CME's mark. So we are not talking here about an entirely unjustified windfall.

This does not mean, however, that CME is entitled to recover $25.5 million. As discussed earlier, the Court has found in favor of the ICE Licensees on their implied license defense for the period from September 20, 2017 to February 23, 2018. The profits for that period of approximately five months must be backed out of the $25.5 million figure. Unfortunately, neither side's expert offered a calculation geared toward

---

[5] The defendants suggested during closing argument that their inability to further apportion their profits was excusable because the point of apportionment is to identify revenues that are affirmatively attributable to infringement. The Court rejects this contention, as it effectively conflicts with established law that an infringer bears the burden of persuasion of apportioning its profits to factors other than infringement. *See WMS Gaming*, 542 F.3d at 608.

these dates.  It therefore falls upon the Court to perform the necessary math.  The resulting calculation is not precise, but precision in awarding damages is not required—and there is no reason to believe the rule is any different when one is awarding profits. *See Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 934 (N.D. Ill. 2010) ("Although damages cannot be based on pure speculation, they need not be calculated with mathematical precision.") (citing *Hoefferle Truck Sales, Inc. v. Divco–Wayne Corp.*, 523 F.2d 543, 553 (7th Cir. 1975)); *Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1342 (7th Cir. 1988) ("The calculation of damages is estimation rather than measurement, and it is foolish to prolong a lawsuit in quest of delusive precision.").  The ICE Licensees' profits attributable to SPAN infringement during what was approximately the thirteen-month period between license expiration and rebrand amounted to $25,536,077.  The implied license defense applies to a period of approximately five months during that stretch, and five is approximately 38.5 percent of thirteen.  CME is not entitled to the profits defendants earned during this five-month period.  Applying the remaining percentage of profits, which is 61.5 percent, to the thirteen-month figure of $25,536,077 results in recoverable profits of $15,704,687.  The Court will enter judgment for CME in that amount.

### B.    Permanent injunction

CME has also asked this Court to issue a permanent injunction directing the ICE Licensees to cease using the SPAN trademark, as well as margining services, software, related user guides, and other SPAN documents on ICE's website.  The Lanham Act permits a court to issue an injunction against in infringer following a finding of trademark infringement, "according to the principles of equity and upon such terms as the court

may deem reasonable."  15 U.S.C. § 1116(a).  The ICE Licensees contend that CME is

not entitled to a permanent injunction because they have stopped using the SPAN

trademark and because CME failed to establish that it has suffered irreparable harm or

that there are inadequate remedies at law.

To determine whether to issue an injunction against the defendants barring

further use of the SPAN mark, the court must evaluate whether CME has established

the following four factors:  (1) CME has suffered irreparable harm; (2) remedies at law

are inadequate; (3) the balance of hardships weighs in favor of CME; and (4) the public

interest would not be served disserved by the injunction.  *EBay, Inc. v. MercExchange,*

*LLC*, 547 U.S. 388, 391-94 (2006); *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*,

No. 14 C 7424, 2015 WL 3633987, at *11–15 (N.D. Ill. June 10, 2015).

CME contends that it suffered irreparable harm because it had no control over

the Defendants' use of the SPAN mark after the license agreements expired.  It also

argues that the remedies at law are inadequate given the ICE Licensees' continued use

of SPAN after it filed the present lawsuit.  CME notes that in November 2019, the ICE

Licensees were advised of their continued use of the SPAN mark after their claimed

rebrand, but they still did not stop use and continue to represent in documents on their

website that they are SPAN licensees.  CME further contends that the balance of

hardships weighs in its favor because the defendants will suffer no hardship if their

conduct is enjoined, but the potential harm to CME is substantial.  CME also asserts

that there is nothing to stop the defendants from their current use of the SPAN mark or

prevent them from engaging infringing conduct in the future.  Finally, CME argues that

the public interest would be served by issuance of the injunction because enforcement

of the trademark laws prevents consumer confusion and the defendants still represent to the public that they are SPAN licensees, when they are not.

The ICE Licensees urge this Court not to apply a presumption that CME will suffer irreparable harm and has no adequate remedy at law without an injunction, despite the Seventh Circuit's long-standing application of this presumption in trademark infringement actions. *See, e.g.*, *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000). They argue that the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S 388 (2006), casts doubt on this presumption because the Court rejected the rule that a permanent injunction must be issued when patent infringement is shown and held that the traditional four-factor framework for injunctive relief should apply. *Id.* at 391-94. The Seventh Circuit has not decided whether *eBay* extends to trademark actions, but it has held that *eBay* applies in the copyright context. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012). In an earlier decision, this Court determined to assess a request for an injunction in a trademark case without applying the presumption, in effect concluding it is likely that it no longer applies. *See Ariel Investments, LLC v. Ariel Capital Advisors LLC*, 238 F. Supp. 3d 1009, 1031 (N.D. Ill. 2017), *rev'd on other grounds*, 881 F.3d 520 (7th Cir. 2018) ("The Seventh Circuit has yet to decide whether [*eBay*'s] holding applies to claims of trademark infringement as well, but other circuits have held that it does."). That said, the Seventh Circuit noted, after *eBay*, that "irreparable harm is especially likely in a trademark case." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013).

Some courts within this circuit have issued decisions in the trademark

infringement context that reflect the position that *eBay* does not extend to trademark cases or, relatedly, that a presumption of irreparable injury is appropriate in trademark actions.  As another judge in this district recently noted, "district courts in this Circuit are divided on the issue."  *Brithric Enters., LLC v. Bay Equity LLC*, No. 20 C 4696, 2021 WL 1208957, at *10 (N.D. Ill. Mar. 31, 2021) (applying the presumption in a trademark case); *see Kellytoy Worldwide, Inc. v. Ty, Inc.*, No. 20 C 748, at *10 (N.D. Ill. Aug. 25, 2020) ("despite *eBay* and *Flava Works*, the Seventh Circuit has continued to recognize the likelihood of irreparable harm in trademark cases"); *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *23, *23 n. 20 (N.D. Ill. June 11, 2015), as amended (June 12, 2015) (listing several applicable cases applying the presumption in the Northern District of Illinois, but declining to apply the presumption).

However, in *Illinois Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2019 WL 4395139 (N.D. Ill. Sept. 13, 2019) (Kennelly, J.), this Court declined to apply the presumption in a trademark case.  *Id.* at *19-20; *see also Verde Envtl. Techs., Inc. v. C2R Glob. Mfg., Inc.* (*In re C2R Global Mfg., Inc.*), No. 18-30182-BEH, 2020 WL 5941330, at *15 (Bankr. E.D. Wis. Oct. 6, 2020) (concluding that the "the Seventh Circuit would, when asked, adopt the reasoning of *eBay* and undertake the full five-factor analysis for preliminary injunctive relief, without applying a presumption of irreparable harm to false advertising cases").

In *Illinois Tamale Co.*, this Court explained:

> Although the Seventh Circuit has not yet addressed whether *eBay* applies to requests for injunctions in Lanham Act cases, it has held that "*eBay* governs a motion for a preliminary injunction in a copyright case."  *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).  This Court sees

no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case. Moreover, other circuits have held that eBay applies in this context. *See, e.g.*, *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006). This Court has likewise applied *eBay* beyond the patent infringement context. *See, e.g., Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *11-15 (N.D. Ill. June 10, 2015). Accordingly, the Court will evaluate Illinois Tamale's motion for a permanent injunction under the traditional four-factor test.

*Illinois Tamale Co.*, 2019 WL 4395139, at *19. Because there does not appear to be a basis for applying a one-off rule regarding presumed harm in trademark cases, this Court will evaluate CME's request for a permanent injunction without applying a presumption of irreparable harm.

Irreparable harm means harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *See Kraft Foods*, 735 F.3d at 740; *see Bernatello's Pizza, Inc. v. Hansen Foods, LLC*, 173 F. Supp. 3d 790, 802 (W.D. Wis. 2016) ("A trademark is essentially the embodiment of the owner's reputation and reputation and unquantifiable market hard flow almost automatically from the likelihood of confusion and loss of control over one's trademark, which are elements of a successful trademark claim."); *see Re/Max North Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001) ("damage to a trademark holder's goodwill can constitute irreparable injury for which a trademark owner has no adequate legal remedy").

Like the plaintiffs in *Ariel Investments* and *Re/Max*, CME contends that it has "no control over the services" the ICE defendants provided and no good way to avoid the "potential harm to [its] goodwill . . . that might arise through mistaken association between the two companies." *See Re/Max*, 272 F.3d at 432; *see Ariel Investments*, 238

F. Supp. 3d at 1031.  In this case, this Court found on summary judgment that CME had shown a likelihood of confusion because "participants in the financial risk services markets" would likely confuse the ICE Licensees' use of the phrase "SPAN for ICE," as well as the SPAN mark in other contexts, for CME's mark.  *See CME I*, 2020 WL 1905760, at *19.  At trial, the evidence showed that the defendants are making no ongoing use of SPAN and that ICE rebranded its margin model as IRM on July 13, 2018.  The Seventh Circuit has held that "[i]n a situation such as this one, in which the challenged conduct has been discontinued . . . the district court will have to determine whether injunctive relief is still appropriate, or whether only declaratory relief is available."  *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999); *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275 (7th Cir. 2009) ("We agree that a voluntary cessation of wrongful conduct is a factor for the court to consider in deciding whether an injunction is necessary.").  That said, voluntary cessation "is not determinative" and under Seventh Circuit precedent, this Court "may consider how easily former practices might be resumed at any time in determining the appropriateness of injunctive relief."  *United Air Lines, Inc.*, 563 F.3d at 275.

In addition, the Supreme Court has emphasized, in the context of a trademark infringement suit, that "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  "Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."  *Id.  "*Given this concern, our cases have explained that 'a defendant claiming that its voluntary compliance moots a case bears the formidable

burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

In this case, the ICE Licensees have met this burden.  They stopped using the SPAN mark and there is no evidence in the record to suggest otherwise.  They have gone farther than that, however:  they rebranded their product and have used only ICE-rebranded software since July 13, 2018.  Finally, as previously discussed, the residual references to SPAN in historic documents and orphan links of SPAN calculator software on the ICE website are not infringing uses, nor is there any reason to believe this will change.

The Court also notes that during closing arguments, CME's description of its request for a permanent injunction included a request that this Court order the ICE Licensees to not only cease using the SPAN trademark, but also cease using SPAN margining software and services.  That request exceeds the bounds of what the Court could appropriately order even if there were a showing of irreparable harm.  The margining services the ICE Licensees offer are part of their overall clearinghouse operations, and they are not part of CME's trademark rights.[6]

---

[6] CME's argument is part of a pattern of conflating two distinct types of conduct.  CME's intellectual property rights and the license agreements covered the use of the SPAN *trademark*, but to support its Lanham Act claims CME repeatedly advanced the position that the ICE Licensees improperly used the SPAN *framework* (also described at trial as the SPAN methodology) supported CME's its Lanham Act claims.  For instance, at trial, CME's damages expert, Schenk testified that the ICE Licensees continued to use CME's methodology after the license expired, which was incorporated into CME's argument that the ICE Licensees engaged in counterfeiting.  And the testimony of a number of witnesses equated the license agreements covering use of the trademarks to agreements covering the methodology.  CME's Lanham Act claims are appropriately

For these reasons, the Court concludes that CME has not established that it is entitled to a permanent injunction barring the ICE Licensees from using the SPAN mark, let alone the SPAN margining software and services. There is, quite simply, no current need for an injunction. *See Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982) (affirming district court's denial of injunction in trademark case "because [defendant] did not threaten to persist in or resume the allegedly infringing or unfair conduct"); *Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 807 (D.C. Cir. 1987) ("When a defendant has ceased its infringing conduct and shows no inclination to repeat the offense, a court may not" broadly enjoin the defendants from using the plaintiff's "trade dress in the future"); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 198 (5th Cir. 1998) ("The cessation of infringing activity does not affect the determination of liability, but it may make an injunction unnecessary."); *Medic Alert Found. U.S., Inc. v. Corel Corp.*, 43 F. Supp. 2d 933, 941 (N.D. Ill. 1999) (denying permanent injunction because "all [defendant's] products containing [the infringing mark] were remastered," "production of the [infringing mark] ceased," and "the number of consumers likely to encounter [the infringing mark] can only be small").

## Conclusion

For the foregoing reasons, the Court directs the Clerk to enter judgment as follows: (1) in favor of the defendants and against the plaintiff on counts 1 and 4 of the plaintiff's amended complaint; (2) in favor of the plaintiff and against the defendants on counts 2, 3, 5, and 6 of the plaintiff's amended complaint and awarding plaintiff profits in

---

grounded only on the basis that use of the SPAN mark violates the law, not use of the SPAN methodology.

the amount of $15,704,687; (3) in favor of the plaintiff and against the defendants on defendants' counterclaim for breach of contract; and (4) denying the plaintiff's request for a permanent injunction.

_____

MATTHEW F. KENNELLY
United States District Judge

Date:  August 17, 2021